[This decision has been published in *Ohio Official Reports* at 97 Ohio St.3d 121.]

THE STATE OF OHIO, APPELLEE, *v*. GROSS, APPELLANT.

[Cite as *State v. Gross*, 2002-Ohio-5524.]

*Criminal law—Aggravated murder—Death sentence vacated and cause remanded for resentencing due to alternate-juror misconduct—Reversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant and either the state has not shown the error to be harmless or the trial court has not cured the error—Crim.R. 24(F).*

(No. 1999-1249—Submitted February 26, 2002—Decided October 30, 2002.)

APPEAL from the Court of Appeals for Muskingum County, No. CT 96-055.

_____

COOK, J.

{¶1} Defendant-appellant, Tony R. Gross, appeals from a Fifth Appellate District judgment that upheld his convictions for aggravated murder, aggravated robbery, and having a weapon under disability. For the following reasons, we affirm Gross's convictions but reverse his death sentence and remand the cause for resentencing on the aggravated murder conviction.

I. Facts

{¶2} At around 3:00 a.m. on July 12, 1994, four juveniles were preparing to distribute the morning newspaper together when they observed a man who appeared to be using the restroom outside the Certified gas station in South Zanesville, Ohio. The juveniles also noticed a yellow car with a black stripe on the side parked at the gas station.

{¶3} While making their deliveries, the juveniles saw the same man drive the yellow car past them. Suspicious, the juveniles informed Muskingum County Deputy Sheriff Lieutenant Michael Lutz about the man while on their route. One

of the juveniles also tried to memorize the yellow car's license plate number and later wrote it down. At around 4:30 a.m., after finishing their paper route, the juveniles returned to a house near the gas station. There, they again saw the yellow car and the same man whom they had observed earlier at the Certified station. The man proceeded to break a lock off the men's restroom door and enter the gas station. One of the juveniles ran inside his home and called the police to report the break-in.

{¶4} Within moments, Lieutenant Michael Lutz arrived at the gas station. Lieutenant Lutz radioed the police dispatcher a description of the yellow car with a license plate of "Nora, Boy, Young, 718"—indicating that the plate read "NBY 718." This was similar to the juvenile's description of the license plate as "NVB-718."

{¶5} The juveniles approached the gas station and watched as Lieutenant Lutz emerged from his police cruiser and walked to the restroom door. The man who had broken into the gas station came out of the bathroom and went to the front of the station, where he threw something away that sounded like metal when it hit the ground; the police later recovered a metal crow bar. Lieutenant Lutz followed the man, who began to argue with the officer. A fight ensued. The deputy sheriff struck the man on the head several times with his flashlight, but then lost hold of the flashlight. As the two men separated, Lieutenant Lutz reached for his gun, saying, "Don't make me do this." Before the officer could retrieve his weapon, however, the man grabbed Lieutenant Lutz's gun and fired twice, hitting the deputy sheriff in the head at least once. Lieutenant Lutz fell to the ground. As the juveniles watched, the man then walked up to Lieutenant Lutz, pointed the gun at the deputy sheriff's head, and fired twice at point-blank range. The man then fled in the yellow car toward Zanesville. One of the juveniles called 911 for an ambulance.

{¶6} Several passing motorists observed portions of the incident. One of them, Karen Wright, was driving on Maysville Pike on her way to work. As she

passed the gas station, Wright noticed Lieutenant Lutz and a man fighting. She slowed down but did not stop, intending to find a pay phone and call for help. Wright later informed officers who arrived on the scene that she had watched the officer's assailant for approximately 30 seconds and that she could see his face. After hearing gunfire, Wright turned around in a parking lot down the road and returned to the gas station. While Wright was waiting in the turn lane to enter the gas station, the yellow car nearly hit her vehicle as it pulled from the gas station and sped away.

{¶7} At approximately the same time, Shawn Jones was also driving on Maysville Pike. He had noticed the juveniles in the gas station parking lot and slowed his vehicle when he heard a gunshot. He observed a man twice shoot Lieutenant Lutz in the face; Lieutenant Lutz was partially lying on the ground when the shooting occurred. Jones drove to a SuperAmerica gas station down the road and told the clerk to call 911. After going to work to inform his coworkers that he had to return to the scene, Jones returned to the Certified gas station and gave the police his statement.

{¶8} Similarly, Sherry Fugate was driving to work when she noticed Lieutenant Lutz's police cruiser behind the gas station. While waiting at a traffic light further down the road, she saw police cars racing toward the gas station. She also saw a yellow car come from the direction of the gas station. As Fugate sat at a red light, the yellow car passed her on the right, ran the light, and traveled down Putnam Avenue onto Van Buren Street, before pulling into an alley behind a bakery. Fugate saw only one person in the yellow car.

{¶9} By the time officers arrived at the gas station, Lieutenant Lutz had died. A pathologist from the Franklin County Coroner's Office later determined that he had died from three gunshot wounds to the head.

{¶10} Ron Johnson was selling crack cocaine that morning from his house in Zanesville when Gross arrived in a yellow car. The back of Johnson's house sits

on the alley into which Fugate had watched the yellow car disappear. Gross left his car running as he entered Johnson's house. Johnson noticed blood running from a cut on Gross's head and gave the man a towel to wipe off the blood. Gross then traded a .9-mm gun that he had for a $50 piece of crack. As Gross left the house, he told Johnson to hide the gun because "it could be life or death." Johnson therefore proceeded to clean the gun of fingerprints and to empty approximately eleven shells from the weapon. He noticed that the gun had blood on its handle. After subsequently hearing that Gross had been arrested and charged with murder, Johnson initially hid the gun under rocks near the Muskingum River, then later retrieved the weapon and hid it in the woods near his home. Based on information Johnson provided, the police eventually recovered the gun, which was stamped with Lieutenant Lutz's unit numbers.

{¶11} Also that morning, shortly after the shooting of Lieutenant Lutz, Village of South Zanesville Chief of Police Bob Van Dyne was given the license number that Lutz had communicated to the dispatcher and informed that the car was registered to Gross. Van Dyne was familiar with Gross and drove to his trailer in South Zanesville. After the dispatcher repeated the license number, Van Dyne realized that the vehicle in the driveway was Gross's car. He radioed for assistance.

{¶12} Several other deputies arrived and set up a perimeter around Gross's trailer. One of the deputies found Gross lying in weeds near his trailer, wearing only pants with no shirt or shoes. He had a recent head injury. Gross eventually surrendered. Because initial radio broadcasts had reported that *two* suspects were involved, the deputies conducted a one-minute protective sweep of Gross's trailer to ensure that another suspect was not inside.

{¶13} The deputies conducted a show-up identification. Karen Wright identified Gross as the man she had observed fighting with Lieutenant Lutz and later identified Gross's yellow car as the yellow car she saw. Shawn Jones identified Gross as the man he saw shoot the deputy. Only one of the juveniles,

however, was able to select only Gross from a photo array of suspects, although he expressed some uncertainty. A second juvenile identified five possible suspects, while another juvenile narrowed the photos to three suspects; both groups included Gross. The fourth juvenile was unable to identify anyone from the group of photographs as the man at the gas station. All four juveniles identified Gross's car from photographs as the vehicle that they had observed at the gas station. Sherry Fugate similarly identified Gross's car as the yellow car that had passed her.

{¶14} The Muskingum County Grand Jury issued a seven-count indictment against Gross. Counts one and two charged aggravated murder, with each count carrying three death specifications—murder of a police officer, felony murder, and murder to escape detection for another offense—as well as firearm specifications. Counts three through six charged Gross with having committed aggravated robbery; each carried a prior aggravated felony conviction specification and a firearm specification. Count seven charged Gross with having had a weapon under a disability and carried a specification of a prior felonious assault conviction. The matter proceeded to jury trial on the first six counts, while Gross waived a jury trial on count seven. The jury found Gross guilty of all six counts and all the specifications that were before the jury, and the trial judge subsequently found Gross guilty of having a weapon while under disability and the remaining specifications. In addition to imposing terms of confinement, the trial court followed the jury's recommendation and imposed the death penalty.

{¶15} Gross appealed to the Fifth District Court of Appeals. That court affirmed his convictions and death sentence. Gross again appealed, and the cause is now before this court upon his appeal as of right.

## II. Pretrial Issues

### A. Search Warrants

{¶16} In his first proposition of law, Gross argues that the trial court erred by failing to suppress evidence obtained as a result of a search warrant that relied

in part on officer observations made during the initial, warrantless entry into his home. Gross then contends in his second proposition of law that, because a second search warrant permitting the state to obtain clothes and blood, hair, and fingernail samples also depended in part on these officer observations, the trial court should have suppressed all evidence obtained pursuant to that warrant. We conclude that neither proposition presents reversible error.

{¶17} We need not resolve the issue of whether officer observations made during the initial, warrantless entry into Gross's trailer could constitute grounds for a search warrant because, even assuming arguendo that they could not, the search warrants properly issued. The United States Supreme Court has held that, after excising tainted information from a supporting affidavit, "if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid." *United States v. Karo* (1984), 468 U.S. 705, 719, 104 S.Ct. 3296, 82 L.Ed.2d 530. See, also, *United States v. Macias* (C.A.10, 1999), 202 F.3d 283, 1999 WL 1244469 (unpublished opinion), quoting *United States v. Snow* (C.A.10, 1990), 919 F.2d 1458, 1460 (" 'An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid' "); *United States v. Whitehorn* (C.A.2, 1987), 829 F.2d 1225, 1231, quoting *United States v. Levasseur* (E.D.N.Y.1985), 620 F.Supp. 624, 631, fn. 2 (" '[i]t is well settled that "[t]he ultimate inquiry * * * is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause" ' "); *State v. Booker* (Nov. 20, 1989), Montgomery App. No. 11255, 1989 WL 140201. Here, the officers' observations during the initial entry into Gross's trailer are not critical to establishing probable cause. Excising the observations, we conclude that the remainder of the supporting

affidavit independently suffices to establish probable cause for the search warrants. Accordingly, Gross's first two propositions of law are not well taken.

B. Identifications

{¶18} In his third and fourth propositions of law, Gross argues, respectively, that photographic and show-up identification procedures were unduly suggestive and produced unreliable pretrial and in-court identifications of Gross that the trial court should have excluded. We again find no reversible error.

{¶19} "The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state." *State v. Brown* (1988), 38 Ohio St.3d 305, 310, 528 N.E.2d 523. Thus, " '[w]hen a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances.' (Emphasis added.)" *State v. Murphy* (2001), 91 Ohio St.3d 516, 534, 747 N.E.2d 765, quoting *State v. Waddy* (1992), 63 Ohio St.3d 424, 438, 588 N.E.2d 819. We have previously recounted those factors to be considered: "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *State v. Broom* (1988), 40 Ohio St.3d 277, 284, 533 N.E.2d 682, citing *Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140.

{¶20} Here, Gross contends that the state subjected the juveniles who were present at the gas station to numerous viewings of Gross or Gross's photograph before the photographic arrays and in-court identifications. The totality of the circumstances, however, weighs in favor of admitting the identifications.

{¶21} Only one of the four juveniles positively identified Gross from two photographic arrays. That witness stated that he ranked the certainty of his pretrial

identification of Gross as a "five" on a scale of one to ten, with ten equaling the most certainty. On cross-examination, the juvenile then admitted that he had seen Gross's picture in the newspaper and that his subsequent in-court identification had been a "three" on the certainty scale. Of the remaining three juveniles, two could identify Gross only as part of a group that included other photographs—and one of these juveniles testified that, after failing to identify Gross in an earlier courtroom appearance, his at-trial identification of Gross depended in part on flashback dreams that he had been having in the interim. The fourth juvenile made no identification.

**{¶22}** We find that the trial court did not abuse its discretion in admitting the identifications. The juveniles' accounts of the investigators' procedures undercut Gross's argument that impermissibly suggestive state action tainted the identification process. To the contrary, the record reflects the state's careful efforts to avoid suggestiveness. The investigators showed the juveniles between 30 and 100 photographs, and there is no evidence that the investigators made suggestions or comments to the juveniles, rushed them, or told them whether they had picked Gross's photograph. Moreover, the circumstances that Gross cites as suggestive— that the juveniles encountered media reports and saw Gross in the courtroom—go to the weight to be given the identifications, rather than their admissibility. See *Brown*, 38 Ohio St.3d at 310-311, 528 N.E.2d 523 (holding that allegedly suggestive circumstances that did not constitute *state* action go to weight and reliability of testimony, not admissibility). Even if we were to conclude that the trial court erred, however, no prejudice attached. See id. at 311, 528 N.E.2d 523. Defense counsel conducted a probing examination of the circumstances surrounding both the photographic arrays and the identifications to allow the jury to assess the value of the juveniles' testimony. Given the totality of the circumstances surrounding the photograph selection procedures and the identifications, we cannot say that reversible error exists.

**{¶23}** Nor can we say that the show-up identification procedures constitute reversible error. Several hours after the murder of Lieutenant Lutz, investigators took both Karen Wright and Shawn Jones to view Gross, who was in custody near the scene. Neither witness spoke to the other. From separate police vehicles, the witnesses observed Gross, who stood with his hands behind his back, between two officers. Both Wright and Jones identified Gross at the scene, in court for a motion hearing, and at trial. Gross complains that the trial court erred in admitting these identifications.

**{¶24}** We agree with Gross that the show-up identification was suggestive. We also reiterate that " '[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned.' " *Broom*, 40 Ohio St.3d at 284, 533 N.E.2d 682, quoting *Stovall v. Denno* (1967), 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199. But the ultimate focus in determining whether reversible error exists is not just on whether the practice was used, but on whether it was so suggestive as to create " ' "a very substantial likelihood of irreparable misidentification." ' " Id., quoting *Neil v. Biggers* (1972), 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (quoting *Simmons v. United States* [1968], 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247).

**{¶25}** Our consideration of the *Manson* factors, 432 U.S. at 114, 97 S.Ct. 2243, 53 L.Ed.2d 140, leads us to conclude that there is not a " 'very substantial likelihood of irreparable misidentification' " in this case. Id. at 105, 97 S.Ct. 2243, 53 L.Ed.2d 140, fn. 8. Both witnesses had time to view Gross during the commission of the crimes; both testified that they had focused their attention on him; both described him prior to the show-up identification; both were confident in their respective identifications (Wright, in fact, testified both at a pretrial motion hearing and at trial that she was 100 percent certain of her identification); and both identified Gross mere hours after witnessing the crime. Although the show-up identification procedures were suggestive, the totality of the circumstances

persuade us that the procedures did not create a substantial likelihood of irreparable misidentification. Accordingly, the trial court did not abuse its discretion in admitting the identifications.

**{¶26}** We therefore reject Gross's third and fourth propositions of law.

## C. Venue and Voir Dire Issues

**{¶27}** In connection with his fifth proposition of law, Gross raises numerous issues related to venue or the selection of the jury. We address each issue in turn.

## Change of Venue

**{¶28}** Citing "overwhelming news coverage" and the fact that he "was charged with killing a beloved member of the community," Gross argues that the jury was not free from outside knowledge or influence and bias. As a result, Gross speculates, "[p]otential jurors were necessarily aware that the failure to impose the death penalty against [him] would be dealt with harshly in the media and in the community." Gross therefore argues that because an impartial jury was impossible, the trial court erred in denying his motion to change venue.

**{¶29}** A motion for change of venue is governed by Crim.R. 18(B), which provides that "[u]pon the motion of any party or upon its own motion the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." We have recently reiterated that the rule "does not require a change of venue merely because of extensive pretrial publicity. *State v. Landrum* (1990), 53 Ohio St.3d 107, 116-117, 559 N.E.2d 710, 722-723. Any decision on a change of venue rests in the sound discretion of the trial court. *Id.* at 116, 559 N.E.2d at 722. ' " '[A] careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " ' *Id.* at 117, 559 N.E.2d at 722, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 262, 357 N.E.2d 1035, 1051, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3135,

10

57 L.E.2d 1155.  A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased.  *Mayola v. Alabama* (C.A.5, 1980), 623 F.2d 992, 996.  Only in rare cases may prejudice be presumed.  *Id*. at 997; see, also, *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554-555, 96 S.Ct. 2791, 2800-2801, 49 L.Ed.2d 683, 694-695."  *State v. Treesh* (2001), 90 Ohio St.3d 460, 463-464, 739 N.E.2d 749.

{¶30} It is indeed true that "[p]retrial publicity can undermine a trial's fairness." *Landrum*, 53 Ohio St.3d at 117, 559 N.E.2d 710.  But Gross has failed to show that "the publicity in this case was so pervasive that it impaired the ability of the empaneled jurors to deliberate fairly and impartially." *Treesh*, 90 Ohio St.3d at 464, 739 N.E.2d 749.  Here, as in *Landrum*, the trial court took effective steps to protect the defendant's rights.  The record is replete with instances of the trial court questioning individual prospective jurors about their exposure to media coverage and their ability to function as fair, impartial jurors.  During the lengthy voir dire, the trial court excused over one hundred prospective jurors, often because they knew an individual involved in the case or because they had formed an opinion regarding Gross's guilt or innocence that they could not set aside.  Each *empanelled* juror, however, stated—without exception—that he or she had not formed an opinion about Gross's guilt or innocence, or that he or she could put aside any such opinion, and that he or she could render a fair and impartial verdict based on the law and evidence presented.  We have previously explained that where "it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion." *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus.  Gross has failed to demonstrate that any seated juror was not impartial.  Accordingly, we cannot say that the trial court abused its discretion in denying Gross's motion for change of venue.

Limited Voir Dire

**{¶31}** Gross argues that the trial court's restrictions on and repeated interruption of voir dire impaired his ability to use peremptory challenges effectively to remove prospective jurors. Gross also complains that the trial court summarily denied defense counsel challenges for cause without permitting counsel to ask appropriate followup questions. We find no merit to these arguments. "The scope of voir dire is within the trial court's discretion and varies depending on the circumstances of each case. Any limits placed thereon must be reasonable." (Citation omitted.) *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913. See, also, *State v. Twyford* (2002), 94 Ohio St.3 340, 345, 763 N.E.2d 122. Accordingly, "[n]o prejudicial error can be assigned to the examination of veniremen in qualifying them as fair and impartial jurors unless a clear abuse of discretion is shown." *State v. Cornwell* (1999), 86 Ohio St.3d 560, 565, 715 N.E.2d 1144. The transcript shows that the trial court was not unduly restrictive; to the contrary, the trial court balanced its obligation to control the inquiry with according counsel latitude in questioning the prospective jurors. See *State v. Lorraine* (1993), 66 Ohio St.3d 414, 419, 613 N.E.2d 212, quoting *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674 (" '[a]lthough R.C. 2945.27 affords the prosecution and defense the opportunity to conduct a reasonable examination of prospective jurors, * * * the trial court reserves the right and responsibility to control the proceedings of a criminal trial pursuant to R.C. 2945.03, and must limit the trial to relevant and material matters with a view toward the expeditious and effective ascertainment of truth' "). Voir dire lasted eleven days, encompassed over 2,500 pages of transcript, and, as we noted in our discussion on venue, featured extensive examination of the prospective jurors by the court, the state, and defense counsel. Although the trial court limited certain areas of inquiry, these limitations were within the discretion of the court. Nor do we find the trial court's interaction with counsel unduly intrusive.

Excusal of Jurors

**{¶32}** Gross claims that the trial court erred in regard to excusing various prospective jurors. First, he asserts that the trial court incorrectly excused jurors who possessed objections to capital punishment but who were not unequivocally opposed to it under all circumstances. Second, he argues that by failing to excuse jurors who stated that they would automatically impose a death sentence upon a conviction for murder, the trial court forced defense counsel to use peremptory challenges unnecessarily. Third, he contends that the trial court failed to fully voir dire the seated jurors to determine whether their knowledge of the facts or persons involved would prevent a fair trial by an impartial jury. Finally, he objects specifically to the trial court's having excused prospective juror Catherine Decker.

**{¶33}** The standard for our review of Gross's complaints is well settled: "[A] court's determination in a *voir dire* proceeding of a prospective juror's fairness and impartiality constitutes reversible error only when it can be shown that the court, in conducting the examination, clearly abused its discretion." *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323.

**{¶34}** We find no reversible error in regard to Gross's first two complaints. Gross first argues that the trial court applied an incorrect standard in excusing jurors for cause, thereby eliminating many jurors who had expressed conscientious but not unequivocal objections to the death penalty. Our decision to reverse his death sentence and remand for resentencing in Section IV(A), infra, renders Gross's first argument moot.

**{¶35}** Gross next asserts that the trial court improperly denied challenges for cause concerning jurors who stated that they could not consider mitigating evidence and would automatically vote to recommend imposition of the death penalty. Gross identifies 19 prospective jurors who he asserts fit into this category.[1]

---

1. Gross fails to identify with accuracy several of the events to which he assigns error. His brief,

As a result of his need to prevent any of these individuals from sitting on the jury, Gross argues, he had to exercise peremptory challenges that he could have reserved for other prospective jurors. Again, given the need for resentencing, Gross's argument is moot insofar as it pertains to the actual sentence he received. Thus, we address Gross's claim of error only to the extent that it could have deprived him of peremptory challenges that he could have used in an attempt to affect the first phase of the trial.

{¶36} The record reflects that Gross's asserted classification is unfounded. Contrary to his representations, many of the 19 prospective jurors Gross identifies stated in response to further questioning—some emphatically so—that, *despite* any personal inclinations favoring capital punishment, they could, and would, follow the law in the sentencing phase. It is well settled that "a prospective juror in a capital case may be excluded for cause if his views on capital punishment '* * * would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " *State v. Coleman* (1989), 45 Ohio St.3d 298, 305, 544 N.E.2d 622, quoting *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841, and *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581. See, also, *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. Consistent with this rule is our holding that "even if a juror shows a *predisposition* in favor of imposing the death penalty, the trial court does not abuse its discretion in overruling a challenge for cause if the juror later states that she will follow the law and the court's instructions." (Emphasis sic.) *Treesh*, 90 Ohio St.3d at 468, 739 N.E.2d 749, citing *State v. Mack* (1995), 73 Ohio St.3d 502, 510, 653 N.E.2d

---

for example, incorrectly states the names of several prospective jurors and cites transcript pages that do not contain what he represents occurred at that point in the proceedings. We have reviewed the entirety of the transcript and have afforded Gross every benefit of the doubt in searching for support for his argument.

329. The prospective jurors here fell into this category, and the record supports the trial court's appropriate exercise of its discretion in refusing to excuse them for cause.

{¶37} By joint agreement of the parties, the trial court excused for cause those identified prospective jurors who *did* express an inability to consider mitigation evidence. And, of those remaining identified prospective jurors, the court excused one for cause solely at defense counsel's urging and another by agreement of the parties based on that individual's position as the county dog warden, a position they regarded as too closely aligned with law enforcement. Therefore, Gross is correct only in that some of the prospective jurors whom he later struck by peremptory challenge initially stated that they regarded capital punishment as the appropriate penalty for the intentional killing of another. But Gross has not identified jurors who maintained that view and whom the trial court nevertheless permitted to remain as prospective jurors, thereby necessitating the use of a peremptory. His claim that the trial court's denials of challenges for cause prejudicially affected his use of peremptory challenges thus lacks support and credibility.

{¶38} The record also contradicts Gross's third complaint, that the trial court conducted an incomplete voir dire. We have already recounted the trial court's efforts to seat an impartial jury in our discussion on venue. The trial court conducted a probing inquiry that addressed the issues of prospective jurors' personal knowledge of the individuals involved in this case and the influence of media reports. The court then permitted counsel for both sides to question the prospective jurors. In the course of this three-pronged examination, all empanelled jurors indicated that they would be able to perform their duties as demanded by the law. The fact that they had heard of the case does not obviate their stated willingness to function as impartial jurors. "While fairness requires that jurors be impartial, jurors need not be totally ignorant of the facts and issues involved. *State*

*v. Sheppard* (1998), 84 Ohio St.3d 230, 235, 703 N.E.2d 286, 292. The trial court [is] entitled to accept [a juror's] assurances that he would be fair and impartial and would decide the case on the basis of the evidence. '[D]eference must be paid to the trial judge who sees and hears the juror.' *Wainwright,* 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 853." *State v. Jones* (2001), 91 Ohio St.3d 335, 338, 744 N.E.2d 1163. Gross has failed to persuade us either that the trial court acted unreasonably, arbitrarily, or unconscionably in declining to excuse any jurors challenged for cause or in deciding that each of the seated jurors would serve impartially.

{¶39} Finally, Gross argues that the trial court should not have granted the state's challenge for cause in regard to Catherine Decker, a prospective juror. Gross asserts that Decker "did not express any reservations about the death penalty" and that "[t]he trial court excused her because of her role as a pharmacist." Excusing Decker because she was a pharmacist cannot constitute prejudicial error. "[A]n erroneous excusal for cause, on grounds other than the venireman's views on capital punishment, is not cognizable error, since a party has no right to have any particular person sit on the jury. Unlike the erroneous denial of a challenge for cause, an erroneous excusal cannot cause the seating of a biased juror and therefore does not taint the jury's impartiality." *State v. Sanders* (2001), 92 Ohio St.3d 245, 249, 750 N.E.2d 90.

### Death-Qualification Process

{¶40} Gross contends that the trial court and the state sought commitments from prospective jurors to sign a recommendation of death, thereby denying him a fair trial. But our reversal of Gross's death sentence renders moot Gross's claim that he did not receive a fair and impartial sentencing jury. See Section IV(A), infra.

### Jury Sequestration

16

**{¶41}** Gross argues that because the trial court did not sequester the jury throughout the course of the trial, he was denied a fair trial. The decision of whether to sequester a jury lies within the sound discretion of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 252-253, 15 OBR 379, 473 N.E.2d 768. See, also, *State v. Osborne* (1976), 49 Ohio St.2d 135, 141-142, 3 O.O.3d 79, 359 N.E.2d 78; *White v. Maxwell* (1963), 174 Ohio St. 186, 189, 22 O.O.2d 140, 187 N.E.2d 878. As in *Maurer*, the trial judge in the instant case routinely admonished the jury not to discuss the case or to read any news accounts about the matter. The trial court was in the best position to gauge the atmosphere of the trial proceedings and to evaluate whether these instructions sufficed over sequestration. Consequently, as in *Maurer*, "[w]e believe that the precautions taken, based in part on our finding that the pretrial publicity fell well short of justifying a change of venue, clearly demonstrate that the court's decisio[n] relative to sequestration [was] not in error." Id., 15 Ohio St.3d at 253, 15 OBR 379, 473 N.E.2d 768. We cannot say that the trial court's declining to sequester the jury throughout the trial was an unreasonable, arbitrary, or unconscionable decision.

### III. Trial Phase Issues

### A. Evidentiary Issues

**{¶42}** Gross asserts in his sixth proposition of law that the trial court erred in permitting the testimony of Ron Johnson, which placed Gross's purchase of crack cocaine before the jury. In his seventh proposition of law, Gross then claims prejudice from the admission of nine allegedly redundant autopsy photographs, three allegedly irrelevant photographs, and the flashlight. He additionally claims that the trial court erred in permitting two individuals to testify as experts on atomic absorption testing. Further, Gross argues in his eleventh proposition of law that the impermissible admission of victim-impact evidence created an emotional atmosphere that rendered his trial fundamentally unfair. Finally, he claims in his

twelfth proposition of law that there was insufficient evidence to support his convictions. None of these propositions of law is well taken.

## "Other Acts" Testimony

**{¶43}** The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice. *State v. Issa* (2001), 93 Ohio St.3d 49, 64, 752 N.E.2d 904. Therefore, we confine our inquiry to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues about which Gross complains. See *State v. Barnes* (2002), 94 Ohio St.3d 21, 23, 759 N.E.2d 1240.

**{¶44}** Gross argues that the trial court erred by admitting prejudicial "other acts" evidence—specifically, the testimony by Ron Johnson that Gross traded the murder weapon for crack cocaine. But our review of the record indicates that Gross failed to timely object to Johnson's testimony at trial. Accordingly, Gross has forfeited all but plain error. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 281, 754 N.E.2d 1150; *State v. Allen* (1995), 73 Ohio St.3d 626, 634, 653 N.E.2d 675.

**{¶45}** Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." We have previously explained that this rule "places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial": (1) "there must be an error, *i.e.,* a deviation from a legal rule," (2) "the error must be plain," which means that it "must be an 'obvious' defect in the trial proceedings," and (3) "the error must have affected 'substantial rights,' " which means that "the trial court's error must have affected the outcome of the trial."[2]

---

2. We note—without deciding the issue in this case—that the phrase "affecting substantial rights" may not *always* be synonymous with "prejudicial." See *Olano*, 507 U.S. at 735, 113 S.Ct. 1770, 123 L.Ed.2d 508 ("There may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome").

*Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240. Further, the decision to correct a plain error is discretionary and should be made " 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " Id., quoting *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶46} We find no plain error here. Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." We have previously held that this rule sets forth "an exception to the common law with respect to evidence of other acts of wrongdoing * * *. The rule * * * contemplate[s] acts which may or may not be similar to the crime at issue. If the other act does in fact 'tend to show' by substantial proof any of those things enumerated, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, then evidence of the other act may be admissible." (Citations omitted.) *Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

{¶47} By testifying as to the details of the crack transaction, Johnson placed the murder weapon in Gross's possession, explained the sequence of events leading to its recovery and connection to Gross, and demonstrated Gross's concern about discovery of the weapon. His "could be life or death" comment reflects consciousness of guilt. See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 161, 749 N.E.2d 226. See, also, *Hartman*, 93 Ohio St.3d at 283, 754 N.E.2d 1150. And, similar to the defendant in *Tibbetts*, Gross was charged with committing aggravated murder while in the course of an aggravated robbery. His desire for drugs was probative of a possible motive to steal and kill. Id., 92 Ohio St.3d at 161, 749 N.E.2d 226, citing *State v. Henness* (1997), 79 Ohio St.3d 53, 61, 679 N.E.2d 686.

Therefore, because Johnson's testimony concerning Gross's postmurder visit to his house tended to show by substantial proof Gross's motive and intent and Gross's identity as Lieutenant Lutz's killer, we cannot say that the trial court abused its discretion in admitting the testimony under Evid.R. 404(B). Because there is no error, Gross has failed to satisfy the first prong of plain-error analysis.

{¶48} Moreover, even if we were to decide that the trial court erred in permitting Johnson to testify as to *why* Gross was at his house, Johnson's testimony as to everything *but* Gross's purpose was proper. And because the "other act" complained of here—purchasing crack cocaine—is of minor significance compared to the gravity of the aggravated murder counts against Gross, any error would be harmless beyond a reasonable doubt. See *Tibbetts*, 92 Ohio St.3d at 161, 749 N.E.2d 226. Gross has therefore also failed to demonstrate that the "error" would have affected the outcome of the trial, the third prong of plain-error analysis.

Gruesome Photographs

{¶49} Gross contends that the trial court erred in permitting the state to introduce nine autopsy photographs that were gruesome and repetitive.[3] He further claims that the prejudicial effect of the photographs outweighed any probative value. Although Gross asserts that his trial counsel objected to the photographs— he even directs our attention to two transcript pages said to contain the objection— the record reveals that Gross's counsel objected at trial *only* to the *timing* of the formal admission of the photographs; counsel wanted to delay the admission of exhibits so any legal debate would not occur in front of the jury. In fact, on one of the transcript pages Gross cites, his counsel stipulates to the admission of the nine photographs in question. Consequently, Gross has forfeited all but plain error. *State v. Coley* (2001), 93 Ohio St.3d 253, 265, 754 N.E.2d 1129.

---

3. Gross's appellate brief states that the state showed the photographs as slides. The exhibits themselves are photographs. We have considered the potential prejudicial impact of both photographs and slides in determining any effect on the trial.

**{¶50}** No plain error occurred. The law regarding the admission of photographic evidence is well settled:

**{¶51}** "Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Landrum*, 53 Ohio St.3d at 121, 559 N.E.2d at 726; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Close-up photographs of victims' injuries, even if gruesome, are admissible in capital cases if the probative value of the photographs outweighs the danger of material prejudice and if the photographs are not repetitive or cumulative in number. *Id*." *Treesh*, 90 Ohio St.3d at 483, 739 N.E.2d 749.

**{¶52}** We have reviewed the nine photographs at issue, all of which depict the wounds Lieutenant Lutz suffered. The photographs serve purposes that we have time and again found sufficiently probative to overcome their inherently disturbing nature. They helped the jury appreciate the nature of the crimes, they illustrated the coroner's testimony, and, by portraying the wounds, they helped to prove Gross's intent and the lack of accident or mistake. See *Coley*, 93 Ohio St.3d at 266, 754 N.E.2d 1129; *Tibbetts*, 92 Ohio St.3d at 156-157, 749 N.E.2d 226; *State v. Evans* (1992), 63 Ohio St.3d 231, 250-251, 586 N.E.2d 1042. Further, the fact that several of the photographs show the same wounds from varying distances does not automatically mean that they are repetitive. Several of the photographs establish the location of a wound but fail to depict the wound as clearly as another photograph that presents a closer view of the wound—which in turn fails to establish the location of the wound as clearly as the more distant photograph. Therefore, we conclude that, given the substantial probative value of the photographs and the fact that they were not particularly inflammatory, coupled with the consequent lack of any unfair prejudice to Gross, the trial court did not abuse its discretion in admitting the evidence. See *Coley*, 93 Ohio St.3d at 265, 754 N.E.2d 1129 ("Decisions on the admissibility of photographs are 'left to the sound discretion of the trial court,'

" quoting *State v. Slagle* [1992], 65 Ohio St.3d 597, 601, 605 N.E.2d 916). See, also, *Treesh*, 90 Ohio St.3d at 483-484, 739 N.E.2d 749; *Landrum,* 53 Ohio St.3d at 121, 559 N.E.2d 710; *State v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267. Further, even if we were to say that because some of the photographs show several of the same wounds from varying distances—a characteristic that this court regarded as nonreversible error in *State v. Thompson* (1987), 33 Ohio St.3d 1, 9, 514 N.E.2d 407—there is no doubt that any such error here is harmless in regard to the guilt phase because of the abundant evidence against Gross. See id. See, also, *State v. Moore* (1998), 81 Ohio St.3d 22, 32-33, 689 N.E.2d 1. Gross has failed to satisfy at least the first and third prongs of our plain-error analysis.

{¶53} Similarly, we find no plain error in regard to the three photographs that Gross claims are irrelevant. Each photograph depicts Gross at the Bethesda Hospital emergency room following his apprehension and shows his head wounds. Again, Gross failed to object to the admission of these photographs. Relevancy attaches to the photographs because they illustrate witness testimony regarding the head wound Gross sustained that morning, a wound that goes to his identity as the man who struggled with and ultimately killed Lieutenant Lutz. Cf. *Coley*, 93 Ohio St.3d at 266, 754 N.E.2d 1129. Thus, we cannot say that the trial court abused its discretion in admitting photographic evidence of the head wound. To the extent that the photographs are repetitive, any such error is harmless in light of the abundant remaining evidence of guilt introduced at trial. *Moore*, 81 Ohio St.3d at 32-33, 689 N.E.2d 1; *Thompson*, 33 Ohio St.3d at 9, 514 N.E.2d 407. Gross's argument fails to satisfy at least the third prong of our plain-error inquiry.

{¶54} Finally, Gross asserts that, because the autopsy photos were before the jury during both the guilt phase *and* the sentencing phase, "the court created a climate in which the jury was unable to dispassionately weigh the aggravating circumstances against the mitigating factors." Given our resolution of Gross's

argument concerning alternate-juror misconduct in Section IV(A), infra, this portion of Gross's photographic-evidence argument is moot.

## The Flashlight

{¶55} At trial, the state introduced a flashlight that belonged to Lieutenant Lutz, which, according to witnesses, the officer had used to strike Gross in the head during their struggle. The state further introduced DNA test results indicating that material on the flashlight was consistent with six genetic markers present in blood obtained from Gross; the forensic scientist/molecular biologist who conducted the test testified that such a result would appear only once in every 6,900 Caucasians tested.

{¶56} Gross argues that admission of the flashlight and test results was error because (1) the officer who retrieved the flashlight from the gas station did not use fresh latex gloves, (2) FBI testing found no genetic material on the flashlight, while subsequent testing by another lab did, and (3) the state failed to preserve a sample of the material for independent testing by the defense. Gross concludes that such alleged errors failed to establish a chain of custody sufficient to satisfy Evid.R. 901(A)'s requirement of proper authentication of evidence as a condition precedent to admissibility.

{¶57} We find no merit in Gross's arguments. As a general matter, "the state [is] not required to prove a perfect, unbroken chain of custody." *State v. Keene* (1998), 81 Ohio St.3d 646, 662, 693 N.E.2d 246. Accordingly, "[a] strict chain of custody is not always required in order for physical evidence to be admissible." *State v. Wilkins* (1980), 64 Ohio St.2d 382, 389, 18 O.O.3d 528, 415 N.E.2d 303. The arguments that an officer failed to change gloves and that a second round of testing found previously undiscovered genetic material on the flashlight go to the *weight* to be afforded the evidence, not to the *admission* of the evidence. See *State v. Richey* (1992), 64 Ohio St.3d 353, 360, 595 N.E.2d 915 ("The possibility of contamination goes to the weight of the evidence, not its admissibility"), overruled

on other grounds, *State v. McGuire* (1997), 80 Ohio St.3d 390, 402-404, 686 N.E.2d 1112. Finally, the state represented to the court at sidebar that a sample of the material sufficient for testing remained available, and that it had informed defense counsel of this fact. The trial court apparently credited this representation and denied a motion for a mistrial by Gross. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the flashlight and related test results over objection.

Expert Testimony

{¶58} Similarly, we cannot say that the trial court abused its discretion in permitting testimony from two technicians from the Ohio Bureau of Criminal Investigating and Identification. Both technicians testified about the results of an atomic absorption test performed on Gross's hands shortly after his arrest. The test revealed gunshot residue on the back of Gross's left hand. Gross asserts that the trial court erred in finding the technicians qualified to present such scientific testimony.

{¶59} But the implicit substance of Gross's argument—that it is unusual to find residue on the left hand of a right-handed individual—goes to the weight of the evidence and not to the qualifications of the expert witnesses. Gross provides no substantive explanation as to why either technician was not qualified. Rather, he presents this court with unsupported conclusory statements challenging the expert's findings and credentials ("Neither [technician] had the appropriate expertise to conduct this testing or [to] present their testimony or to give their opinions. [Evid.R.] 602, 701, 702, 703. Their testimony was neither within their personal knowledge nor was it rationally based on their perceptions nor helpful to the jury").

{¶60} Both technicians supplied their credentials during extensive voir dire. "Pursuant to Evid.R. 104(A), the trial court determines whether an individual qualifies as an expert, and that determination will be overturned only for an abuse

of discretion." *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128. We have reviewed the voir dire of both technicians and can discern no reason why, under the Evid.R. 702(B) standards for qualifying witnesses as experts, we should consider the trial court's decision unreasonable, arbitrary, or unconscionable. Gross's conclusory argument is rejected.

Victim-Impact Evidence

**{¶61}** In his eleventh proposition of law, Gross argues that the admission of victim-impact evidence in both phases of the trial rendered the proceedings fundamentally unfair. He cites the following as constituting such victim-impact evidence: statements by jurors that they knew Lieutenant Lutz or had encountered media coverage of the crime; autopsy photographs; testimony that Lieutenant Lutz's son, who is also a police officer, had arrived at the scene of the crime; testimony by Karen Wright that when she returned to the gas station after hearing the gunshot, Lieutenant Lutz rolled over and looked at her before he died; the fact that officers were visibly emotional while testifying; and the admission of Lieutenant Lutz's clothes and some personal items.

**{¶62}** Nothing Gross identifies, however, presents us with reversible error. Juror statements and exposure to media reports are not evidence. We have already rejected Gross's arguments in regard to these issues in our discussion of venue and voir dire. We also find unpersuasive his arguments related to the autopsy photographs, Wright's discovery of Lieutenant Lutz, and the admission of the victim's clothes and personal belongings. It is well settled that "[e]vidence relating to the facts attendant to the offense * * * is clearly admissible during the guilt phase. As a result, we find that evidence which depicts *both* the circumstances surrounding the commission of the murder and also the impact of the murder on the victim's family may be admissible during *both* the guilt and the sentencing phases." (Emphasis sic.) *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878. Each of the items about which Gross complains establishes the circumstances of the crime. See *Lorraine*, 66 Ohio St.3d at 420, 613 N.E.2d 212 (holding that "the physical condition and circumstances of the victims are relevant to the crime as a whole" and are admissible as evidence illustrating the nature and circumstances of a crime).

26

{¶63} We also find no merit in Gross's complaint about an incidental mention of Lieutenant Lutz's son, also a law enforcement officer. The first law enforcement officer to arrive at the Certified gas station after the shooting testified as to his discovery of Lieutenant Lutz, the condition of the victim, and the fact that Lieutenant Lutz's gun was missing. After the officer testified that other officers had arrived and assumed his duties, the state asked, "What did you do then?" The officer responded, without objection, "I went over to grab Matt. He wanted to see his dad." The officer then explained that he left the gas station. To the extent that the mention of the victim's son can be said to constitute victim-impact evidence, we conclude that it does not constitute a violation of Gross's constitutional rights. The reference to the victim's son was not detailed, not inflammatory, and not the focus of the testimony. Viewing the facts of this case as a whole, we cannot say that these two sentences of testimony constitute prejudice. See *Lorraine*, 66 Ohio St.3d at 420-421, 613 N.E.2d 212 (in determining whether prejudice exists, evidence that would cause a jury to empathize with a victim must be viewed against all of the facts of a case).

{¶64} Finally, given our resolution of that portion of Gross's fourteenth proposition of law concerning the penalty phase, see Section IV(A), infra, his arguments as to all evidence introduced during that phase are moot.

{¶65} Accordingly, confining our inquiry to any victim-impact evidence introduced in the guilt phase, we find that any evidence that may have constituted victim-impact evidence did not prejudice Gross. To the extent that testimony included emotional responses—such as testimony by officers—we agree with the court of appeals that "[i]t is difficult to conceive of an aggravated murder trial that does not include an element of strong emotion." Gross's eleventh proposition of law is rejected.

Sufficiency of the Evidence

{¶66} In his twelfth proposition of law, Gross asserts that there was insufficient evidence to convict him of aggravated murder, any of the aggravating specifications, and aggravated robbery. He therefore argues that the trial court erred in failing to grant his Crim.R. 29 motions. This argument is without merit.

{¶67} "When reviewing the sufficiency of evidence to support a criminal conviction, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Tibbetts*, 92 Ohio St.3d at 161-162, 749 N.E.2d 226, quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. See, also, *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. When conducting this review, we do not weigh the evidence; rather, our inquiry is limited to whether reasonable minds could reach the conclusion reached by the trier of fact. See *Tibbetts*, 92 Ohio St.3d at 162, 749 N.E.2d 226; *Treesh*, 90 Ohio St.3d at 484, 739 N.E.2d 749. Issues concerning the weight given to the evidence and the credibility of witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶68} We begin with the essential elements of the crimes. The state charged Gross with two counts of aggravated murder in violation of former R.C. 2903.01(A) and (B). This statute provided:

{¶69} "(A) No person shall purposely, and with prior calculation and design, cause the death of another.

{¶70} "(B) No person shall purposely cause the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape." 139 Ohio Laws, Part I, 3.

**{¶71}** The state also charged Gross with four counts of aggravated robbery in violation of former R.C. 2911.01(A)(1) and (2). That statute provided:

**{¶72}** "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after such attempt or offense, shall do either of the following:

**{¶73}** "(1) Have a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control;

**{¶74}** "(2) Inflict, or attempt to inflict serious physical harm on another." 140 Ohio Laws, Part I, 590.

**{¶75}** R.C. 2913.01(K)(1) in turn defines a theft offense to include "[a] violation of * * * 2911.13 [or] 2913.02." The state charged Gross with violations of both statutes. R.C. 2911.13, the breaking-and-entering statute, provides:

**{¶76}** "(A) No person[,] by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony.

**{¶77}** "(B) No person shall trespass on the land or premises of another, with purpose to commit a felony."

**{¶78}** R.C. 2913.02(A)(1), the theft statute, provided that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent[.]"

**{¶79}** The state further sought to prove the charged specifications.[4] Under R.C. 2929.04(A)(3), the state had to prove beyond a reasonable doubt that Gross committed the aggravated murder to escape detection, apprehension, trial, or punishment for another offense. Under former R.C. 2929.04(A)(6), the state had

---

4. Gross's appellate brief states that the state showed the photographs as slides. The exhibits themselves are photographs. We have considered the potential prejudicial impact of both photographs and slides in determining any effect on the trial.

to prove beyond a reasonable doubt that Lieutenant Lutz was a peace officer as defined in R.C. 2935.01, that Gross knew or had reason to know this fact, and either that Lieutenant Lutz was engaged in his duties at the time of the offense or that Gross's specific purpose was to kill a peace officer. The definition of a peace officer includes "a sheriff [or] deputy sheriff." R.C. 2935.01(B). Under R.C. 2929.04(A)(7), the state also had to prove that Gross committed the aggravated murder while "committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * aggravated robbery," and that Gross was either "the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." All counts also carried a firearm specification, requiring that the state prove that Gross had a firearm on or about his person or under his control while committing the offense. The state also had to prove that Gross had a prior aggravated felony conviction.

{¶80} The evidence adduced at trial, construed in a light most favorable to the state, supports concluding that a rational trier of fact could have found that the state proved each necessary element beyond a reasonable doubt. Four juveniles observed a man, whom one of them later identified as Gross, break a lock off a restroom door and enter the Certified gas station. They also observed the man's car, with one of them attempting to memorize the license plate. The juvenile's memorized plate number was similar to the plate number on Gross's car.

{¶81} Upon arriving at the gas station, Lieutenant Lutz radioed police dispatch a description of the car he found there, as well as the license plate number. Both corresponded to Gross's vehicle.

{¶82} From different vantage points, the juveniles also observed Gross attack Lieutenant Lutz. They watched as Lieutenant Lutz struck Gross in the head with a flashlight, as Gross took the officer's firearm, and as Gross shot the deputy

sheriff, wounding him. Gross then walked up to the fallen officer and shot him repeatedly in the head, killing him, before fleeing in the yellow car.

{¶83} Testimony by other witnesses confirmed these events and provided further identifications. While Gross was attacking Lieutenant Lutz, motorist Karen Wright passed by the gas station. She saw the men fighting, observed Gross's face, and heard gunfire as she passed the gas station. Similarly, motorist Shawn Jones saw the fight and watched as Gross—and only Gross—shot Lieutenant Lutz repeatedly, killing him. Wright also saw Gross's vehicle speed from the gas station as she returned to assist the officer. Motorist Sherry Fugate testified that she watched a yellow car, which she later identified as Gross's car, as it sped away from the gas station and into an alley that morning.

{¶84} Ron Johnson, who lived in a house located off that same alley, testified that Gross came to his house that morning in the yellow car. He explained how Gross traded a gun (later identified through serial numbers to be Lieutenant Lutz's gun) for crack cocaine. He also testified that Gross was bleeding from a head wound, and that Gross told him to hide the gun, because "it could be life or death." Johnson explained the sequence of events that led to his turning the gun over to the authorities.

{¶85} Numerous officers testified concerning Gross's capture. The South Zanesville Chief of Police testified that he had arrived at Gross's trailer and found the yellow car, still warm and bearing none of the condensation that a car not recently driven would have had. After forming a perimeter around Gross's trailer, officers found Gross hiding in nearby weeds. He had a head wound that appeared to be fresh. Shortly after Gross was taken into custody, Karen Wright identified Gross as the man she had seen fighting with Lieutenant Lutz. Shawn Jones similarly identified Gross as the man he had watched murder the officer. Both witnesses, as well as the juveniles, identified Gross's car as the vehicle that they had seen at the gas station.

**{¶86}** The state introduced all of this testimony at trial. The state also introduced evidence demonstrating that Lieutenant Lutz was a deputy sheriff performing his duties at the time of his murder, facts that Gross did not contest. Two of the juveniles testified that Gross was the man they had observed. Wright and Jones also again identified Gross. The state further presented the testimony of a pathologist who had examined Lieutenant Lutz's body, and who had determined that the officer died as a result of the gunshot wounds to his head. Testimony regarding the serial number established that the gun recovered from Ron Johnson was Lieutenant Lutz's gun. Additional scientific evidence linked Gross to the crime. Expert testimony established that it was "very probable" that a shoe recovered from Gross's trailer matched a shoe print found on a toilet seat taken from the gas station restroom. Material found on Lieutenant Lutz's flashlight matched Gross's DNA, and Gross's head wound was consistent with the juveniles' account of the fight. Further, the results of an atomic absorption test revealed gunshot powder residue on Gross's hand.

**{¶87}** We also note that prior to sentencing, the state introduced into evidence without objection a certified copy of Gross's prior 1980 conviction for felonious assault. Because Gross challenges "all" of his convictions, we assume that his sufficiency challenge includes his conviction for having a weapon while under disability, which was tried to the court. Under former R.C. 2923.13(A)(2), the state had to prove that Gross knowingly acquired, had, carried, or used a firearm or dangerous ordnance after having been convicted of a felony of violence. 134 Ohio Laws, Part II, 1966. Felonious assault, a violation of R.C. 2903.11, is such a felony. R.C. 2903.11(B).

**{¶88}** Given the foregoing evidence, we conclude that the trial court properly denied Gross's Crim.R. 29 motions and that sufficient evidence exists to support the charge of having a weapon under a disability and related specifications tried to the trial court. We find Gross's twelfth proposition of law not well taken.

B. Jury Instructions

**{¶89}** In connection with his eighth proposition of law, Gross alleges that the trial court erred in five instructions given to the jury as part of the first phase of the trial. Because none of his arguments demonstrates reversible error, we find that this proposition is not well taken.

**{¶90}** First, Gross argues that the trial court failed to instruct the jury properly on purpose and causation. The trial court instructed the jury as follows:

**{¶91}** "Purpose to kill is an essential element of the crime of aggravated murder.

**{¶92}** "A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there were [sic] present in the mind of the Defendant a specific intention to kill Lieutenant Michael Lutz.

**{¶93}** "Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing.

**{¶94}** "* * *

**{¶95}** "No purpose—no person be [sic] may be convicted of aggravated murder unless he specifically intended to cause the death of another.

**{¶96}** "* * *

**{¶97}** "* * * Cause is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the death of a person and without which it would not have occurred.

**{¶98}** "The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act or failure to act. The Defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act or failure to act."

**{¶99}** Gross contends that the result of including "foreseeable" in this instruction was that the trial court "relieved [the state] of its burden to prove an essential element of the crime—specific intent to kill the victim." We disagree. This court has previously upheld a trial court instruction on causation that was for all practical purposes identical to the instant charge in *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 230-231, 744 N.E.2d 163. There, we reaffirmed that " '[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge.' " Id. at 231, 744 N.E.2d 163, quoting *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. See, also, *Cupp v. Naughten* (1973), 414 U.S. 141, 146-147, 94 S.Ct. 396, 38 L.Ed.2d 368. In both cases, when viewed in the requisite full context, the trial court's instructions adequately conveyed to the jury that it could not convict the defendants of aggravated murder unless it found specific intent to kill. "The instruction on foreseeable consequences does not constitute error * * * since other instructions given by the court limited any prejudicial effect." *Jalowiec*, 91 Ohio St.3d at 231, 744 N.E.2d 163, citing *State v. Getsy* (1998), 84 Ohio St.3d 180, 196, 702 N.E.2d 866. See, also, *State v. Frazier* (1995), 73 Ohio St.3d 323, 331, 652 N.E.2d 1000; *State v. Burchfield* (1993), 66 Ohio St.3d 261, 262-263, 611 N.E.2d 819. We therefore find the purpose and causation instructions sufficient.

**{¶100}** We also find that the following trial court instruction does not constitute reversible error:

**{¶101}** "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon."

**{¶102}** Gross argues that there is no statutory basis for such an instruction and that it is an unconstitutional mandatory presumption. But we have recognized that " 'where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence

presumed to have been intended.  Such evidence is sufficient to allow a jury to find a purposeful intent to kill.' " *State v. Esparza* (1988), 39 Ohio St.3d 8, 14, 529 N.E.2d 192, quoting *State v. Jester* (1987), 32 Ohio St.3d 147, 152, 512 N.E.2d 962.  The trial court's use of "may" communicates that the jury was free to accept or reject a permissive *inference*; it does not communicate a conclusive presumption that "relieved the state of its burden of persuasion on the issue of criminal intent." See *Price*, 60 Ohio St.2d at 142, 14 O.O.3d 379, 398 N.E.2d 772.  See, also, *Francis v. Franklin* (1985), 471 U.S. 307, 315, 105 S.Ct. 1965, 85 L.Ed.2d 344 ("If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption"); *Sandstrom v. Montana* (1979), 442 U.S. 510, 527-528, 99 S.Ct. 2450, 61 L.Ed.2d 39 (Rehnquist, J., concurring) (recognizing that jury charges that describe *permissive inferences* do not run afoul of constitutional protections against impermissible burden-shifting presumptions and conclusive presumptions).  Thus, we conclude that the jury instruction did not prejudice Gross.

{¶103} Gross also attacks the trial court's instruction defining "reasonable doubt" based on the definition set forth in R.C. 2901.05(D).  We have continuously rejected this argument.  See *State v. Jones* (2000), 90 Ohio St.3d 403, 417, 739 N.E.2d 300; *Moore*, 81 Ohio St.3d at 33, 689 N.E.2d 1; *Frazier*, 73 Ohio St.3d at 330, 652 N.E.2d 1000; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus.

{¶104} Finally, Gross claims prejudice as a result of the trial court's failure to define for the jury key terms used in the instructions regarding R.C. 2929.04 specifications.  He faults the trial court for not defining what constitutes "escaping

detection" in its instruction that, if the jury reaches the third aggravated murder specification, it must then decide "whether the State has proved beyond a reasonable doubt that the Defendant * * * committed the offense of aggravated murder for the purpose of escaping detection, apprehension, trial or punishment for another offense committed by the Defendant." Gross further faults the trial court for not requiring unanimity from the jury on the "other offense" and for not defining "principal offender."

{¶105} Gross timely objected on the issue of unanimity. But there is no record of Gross's timely raising his "escaping detection" and "principal offender" arguments to the trial court. While the trial court permitted defense counsel to build a record of objections to the instructions after the jury retired to deliberate, those objections never included these specific arguments. Accordingly, Gross has waived all but plain error for these arguments. See *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; Crim.R. 30(A).

{¶106} In regard to his lack-of-definition arguments, Gross has failed to establish plain error. Because "terms of common usage * * * need not be defined for the jury," *State v. Riggins* (1986), 35 Ohio App.3d 1, 8, 519 N.E.2d 397, the trial court's failure to define "escaping detection" presents no error. Moreover, we note that considering that Lieutenant Lutz arrived and found Gross *in the gas station*, the officer had already *detected* Gross. We therefore cannot say that the lack of a detailed "escaping detection" instruction can constitute prejudice under the third prong of our plain-error inquiry when the unchallenged "escaping * * * apprehension, trial or punishment for another offense" qualifiers are more likely to have contributed to the jury's verdict.

{¶107} Nor does prejudice arise from the trial court's failure to define "principal offender." Gross contends that the failure to define the term "relieved the state of its burden of proof and denied Gross due process and a fair trial." The trial court should have defined "principal offender" for the jury. See *State v. Chinn*

(1999), 85 Ohio St.3d 548, 559, 709 N.E.2d 1166. But the state's theory of the case was that Gross acted *alone* in killing Lieutenant Lutz. As in *Chinn*, "[t]here was no evidence to suggest that appellant, if he was present at the time of the aggravated murder, was anything but the actual killer." Id. at 560, 709 N.E.2d 1166. Thus, to have found Gross guilty under the state's theory of the case, the jury necessarily must have found that Gross was the principal offender. Gross has failed to satisfy the third prong of our plain-error analysis. Given the overwhelming evidence of guilt, "[t]he facts in this case fall far short of meeting the criteria for plain error. We see no miscarriage of justice in this case." *Underwood*, 3 Ohio St.3d at 14, 3 OBR 360, 444 N.E.2d 1332. See, also, *Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.

{¶108} Last, we note that the trial court stated that it had sufficiently instructed the jury regarding unanimity. We need not parse the trial court's instructions to decide the issue because, even assuming error, the fact that the jury *unanimously* found Gross guilty of the "other offense" would render any such error harmless. Cf. *Moore*, 81 Ohio St.3d at 40, 689 N.E.2d 1. Accordingly, we reject Gross's complaints regarding the guilt-phase jury instructions.

### C. Juror Misconduct

{¶109} In his fourteenth proposition of law, Gross asserts that his convictions and death sentence were the result of juror misconduct. Specifically, he argues that the trial court should have dismissed a juror for discussing the case outside the courtroom and for forming an opinion as to Gross's guilt or innocence prior to deliberations, that this conduct necessitated that the trial court declare a mistrial, and that the trial court should have declared a mistrial or granted a new trial based on the participation of alternate jurors in the penalty-phase deliberations. Gross also alleges that the trial court's failure to correct these errors "deprived [him] of a full and fair opportunity to develop the full factual predicate for this error, thus depriving him of due process."

{¶110} We address here Gross's claim that a juror had disobeyed the trial court's instructions by discussing the case and forming an opinion before deliberations. Although defense counsel had learned of an instance of alleged juror misconduct prior to closing arguments, counsel waited until just prior to the jury's returning with its verdicts at the end of the guilt phase to bring the matter to the trial court's attention. In response, before the sentencing phase commenced, the trial court received testimony from Travis Gross, Gross's nephew. Travis testified that while attending a community picnic/fitness competition, he overheard one of the jurors discussing the trial from a distance of twenty-five to thirty feet away. According to Travis, the juror had stated, when asked by another person how the trial was going, "It shouldn't be much longer because I think he's guilty."

{¶111} After receiving this testimony, the trial court then questioned the juror accused of misconduct. The juror testified that while at the picnic, two people asked him about the case because they had heard that he was on the jury. He testified that he acknowledged that he was a juror but that he did not discuss the merits of the case. The juror also specifically denied that he had told anyone that he had made up his mind about the case.

{¶112} The trial court decided that the juror should remain part of the jury. In so doing, the trial court considered that Travis admitted that at the time of the alleged impropriety, he had been twenty-five to thirty feet away from the juror, in a crowded area where many people were talking, with ten to fifteen tables separating him from the juror. The trial court also noted the juror's specific denial of misconduct and that the juror had confirmed only that he was on the jury, a matter of public record.

{¶113} Gross argues that the trial court should have granted a mistrial over this issue. But the record does not reflect that Gross ever moved for a mistrial on these grounds. Rather, Gross merely asked that the trial court replace the juror with

an alternate juror. Accordingly, we review only the decision actually made by the trial court.

{¶114} A trial court is permitted to rely on a juror's testimony in determining that juror's impartiality. *State v. Herring* (2002), 94 Ohio St.3d 246, 259, 762 N.E.2d 940, citing *Smith v. Phillips* (1982), 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78, fn. 7. Here, the trial court's ruling reflects that the court believed the juror and apparently did not believe Travis. As noted, issues concerning the weight given to the evidence and the credibility of witnesses are primarily for the trier of fact. *DeHass*, 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Cf. *State v. Fears* (1999), 86 Ohio St.3d 329, 337-338, 715 N.E.2d 136 (acknowledging that a trial judge is in the best position to observe the demeanor and body language of prospective jurors and decide whether they can be impartial and follow the law). Further, given the trial court's rejection of Travis's account, Gross has failed to demonstrate the requisite prejudice resulting from the alleged communication. See *State v. Sheppard* (1998), 84 Ohio St.3d 230, 233, 703 N.E.2d 286. We thus cannot say that the trial court erred in declining to seat an alternate in place of the juror.

{¶115} We reserve our discussion of Gross's claim of alternate-juror misconduct during the penalty phase for Section IV(A), infra.

D. Ineffective Assistance of Counsel

{¶116} In his thirteenth proposition of law, Gross argues that he was denied the effective assistance of counsel. It is well settled that a reviewing court may not reverse a conviction on the grounds of ineffective assistance of counsel unless a defendant shows "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. 'To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable

probability that, were it not for counsel's errors, the result of the trial would have been different.' *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus." *Treesh*, 90 Ohio St.3d at 489, 739 N.E.2d 749. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Sanders*, 92 Ohio St.3d at 273, 750 N.E.2d 90, quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. As part of this inquiry, "[a] reviewing court must strongly presume that 'counsel's conduct falls within the wide range of reasonable professional assistance,' and must 'eliminate the distorting effects of hindsight, * * * and * * * evaluate [counsel's] conduct from counsel's perspective at the time.' " *Sanders*, 92 Ohio St.3d at 273, 750 N.E.2d 90, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶117} Applying this standard, we have reviewed Gross's extensive list of his trial counsel's alleged deficiencies, all of which we find meritless.[5] Gross's claim that counsel failed to engage in reasonable investigation and preparation must fail because the record before us does not reveal these alleged errors. See *State v. Nields* (2001), 93 Ohio St.3d 6, 35, 752 N.E.2d 859, citing *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Sanders*, 92 Ohio St.3d at 274, 750 N.E.2d 90. And given our examination of defense counsel's extensive questioning of prospective jurors, discussed supra, the record also fails to support Gross's allegations that counsel were ineffective during voir dire. Similarly, the record does not support Gross's complaints that counsel failed to argue for a change of venue effectively (counsel sought to obtain a change vigorously), that counsel failed to counter the state's challenges for cause (counsel did, and often joined the challenges), and that counsel failed to challenge the state's use of a peremptory

---

5. Given our reversal of Gross's death sentence in Section IV(A), infra, those instances of alleged ineffective assistance that Gross cites as affecting the sentencing phase are moot.

challenge under *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (counsel objected).

{¶118} Gross also faults counsel for not requesting funds to employ expert investigators and witnesses (1) to challenge the state's testing procedures of evidence, (2) to demonstrate the unreliability of eyewitness identifications, (3) to support his motions to suppress, and (4) to help provide an adequate defense in general. To obtain such funds, however, Gross would have had to make a particularized showing of a reasonable probability that the requested expert would have aided his defense, and that the denial of the requested expert assistance would have resulted in an unfair trial. See *State v. Mason* (1988), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus. Gross, however, has failed to demonstrate either proposition. See, e.g., *State v. Madrigal* (2000), 87 Ohio St.3d 378, 390-391, 721 N.E.2d 52 (declining to find ineffective assistance based on failure to employ eyewitness identification expert because "[n]othing in the record indicates what kind of testimony an eyewitness identification expert could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal"). Thus, we cannot say that counsel was ineffective in this regard by employing only a psychiatrist, a mitigation specialist, and an investigator. See *Jalowiec*, 91 Ohio St.3d at 236, 744 N.E.2d 163.

{¶119} Further, we reject Gross's allegation of ineffectiveness predicated on his claim that "[c]ounsel failed to properly and effectively demand that the State provide a detailed and descriptive Bill of Particulars." The record reflects that Gross's original trial counsel (later replaced) filed a motion for a bill of particulars, that Gross's second counsel obtained a trial court order for the state to supply the bill, and that the state complied. Given that counsel was conducting extensive discovery during this process, we agree with the court of appeals that a more detailed bill of particulars was unnecessary.

**{¶120}** Gross cites one instance in which counsel waived his presence without first obtaining an on-the-record waiver. This occurred when the trial court gave prospective jurors a witness list so that they could mark on the list anyone they knew. Without deciding that this was error, we conclude that Gross has failed to demonstrate a reasonable likelihood that the result of the trial would have been different had he been present. *Treesh*, 90 Ohio St.3d at 489, 739 N.E.2d 749. See, also, *Herring*, 94 Ohio St.3d at 262, 762 N.E.2d 940; *State v. Green* (2000), 90 Ohio St.3d 352, 371-372, 738 N.E.2d 1208; *State v. Clark* (1988), 38 Ohio St.3d 252, 258, 527 N.E.2d 844.

**{¶121}** Finally, Gross asserts—often without explanation or elaboration—perceived deficiencies ranging from counsel's failure to suppress evidence, to challenge effectively the jury array, to move for a change of venue successfully, to object successfully to testimony and evidence, to cross-examine witnesses effectively, and to move for a change in the starting date of the trial. We note that in many instances, such as in regard to the jury array issue, Gross overlooks that counsel mounted vigorous but unsuccessful challenges. Counsel filed over fifty pretrial motions concerned with substantive aspects of the proceedings. Gross's allegations thus equate a lack of success with a failure to render effective assistance of counsel. But we cannot say that the manner in which counsel conducted unsuccessful challenges falls below the wide range of what constitutes reasonable professional assistance. Further, Gross ignores that counsel's decisions often fell within the realm of trial strategy. See *Hartman*, 93 Ohio St.3d at 296, 754 N.E.2d 1150 (failure to object can be legitimate tactical decision); *Issa*, 93 Ohio St.3d at 68, 752 N.E.2d 904, citing *State v. Taylor* (1997), 78 Ohio St.3d 15, 31, 676 N.E.2d 82 ("Counsel is certainly not deficient for failing to raise a meritless issue"). Gross also overlooks that minor missteps are not tantamount to ineffective assistance; a complaining defendant must still demonstrate prejudice. See *Fears*, 86 Ohio St.3d at 347, 715 N.E.2d 136, quoting *State v. Holloway* (1988), 38 Ohio St.3d 239, 244,

527 N.E.2d 831 (" '[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel' "). None of the instances Gross cites, either individually or collectively, determined the outcome of the guilt phase of his trial. See *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Gross's claims of ineffective assistance of counsel fail.

### IV. Penalty-Phase Issues

### A. Alternate-Juror Misconduct

{¶122} As noted, Gross asserts in his fourteenth proposition of law that the trial court erred in not declaring a mistrial or granting a new trial based on the participation of alternate jurors in the penalty-phase deliberations. During the trial court's sentencing recommendation instructions to the jury, the trial court also instructed the alternate jurors as follows:

{¶123} "Now, there are five of you who have been selected as alternate jurors in this case. You will retire to the jury room with the original panel of 12 jurors. However, you are instructed that you will in no way participate in the deliberations.

{¶124} "You will listen and watch the deliberations, but under no circumstances are you to participate in said deliberations by discussing with the original jurors or among yourselves, or even make gestures during these deliberations. You are there to listen and to watch only. Again, under no conditions are you to engage in any conversations during any deliberations."

{¶125} The members of the jury and the five alternate jurors then retired to the jury room. Subsequent events, however, revealed that at least one alternate did not follow the trial court's instructions. During deliberations, the jury foreman forwarded a signed note to the trial court that read:

{¶126} "Question: Are the alternates allowed to play a game of cards with attention to the process in section [sic, session]?"

{¶127} The trial court responded in the negative. Just over two hours later, the jury foreman forwarded another signed note to the trial court:

{¶128} "Question: One alternate is expressing his feelings about the other jurors in a manner that he thinks isn't right. Everyone is really tense about this. He feels things are going wrong and thinks some people are getting pressured in making decisions. It's to the point he thinks it [sic] wrong. I on the other hand feel no one has been swayed by force."

{¶129} In response to this note, the trial court took sworn testimony, subject to examination by counsel, from the two bailiffs responsible for the sequestered jury. Both bailiffs testified that during the jury's deliberations, the jury foreman knocked on the jury room door and told the bailiffs, "It's getting out of hand in here, the alternates are throwing pens and thing[s]." One of the bailiffs told the foreman to put his concerns in writing; this concern constituted the second note set forth above. At that point, defense counsel unsuccessfully moved for a mistrial. The record reflects that the trial court decided to bring the jury and alternates back into the courtroom and repeat the instructions. Before this occurred, however, the jury foreman sent the trial court another signed note:

{¶130} "Question: Both people that were accused of being 'pressured' by the alternate told me when asked if they were pressured, that they did not feel that way.

{¶131} "We have come to a decision."

{¶132} The record next indicates that, without following through on the plan to reinstruct the jury, the trial court brought the jurors and five alternates into the courtroom and received the recommendation that Gross be sentenced to death.

{¶133} The foregoing scenario evinces error on the part of the trial court. In *State v. Jackson* (2001), 92 Ohio St.3d 436, 751 N.E.2d 946, this court unanimously held that allowing alternate jurors to sit in on sentencing deliberations constituted error. Id. at 439, 751 N.E.2d 946, citing *United States v. Olano* (1993),

507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508. See, also, *Murphy*, 91 Ohio St.3d at 531-533, 747 N.E.2d 765 (explaining that "[i]n an ordinary criminal case, Crim.R. 24[F] requires that any alternate juror not substituted for a regular juror be discharged when the jury retires"). In both *Jackson* and *Murphy*, the respective defendants had failed to object to the presence of the alternate jurors. We therefore confined our review to a plain-error analysis that does not presume prejudice. *Jackson*, 92 Ohio St.3d at 440, 751 N.E.2d 946; *Murphy*, 91 Ohio St.3d at 533, 747 N.E.2d 765. Further, in both cases the facts presented no indication of actual harm to the defendant. There was, for example, no showing by the defense that "the alternates disobeyed the court's instructions [not to participate] by participating in the deliberations, either verbally or through body language, or that their presence chilled the deliberative process." *Murphy*, 91 Ohio St.3d at 533, 747 N.E.2d 765. See, also, *Jackson*, 92 Ohio St.3d at 440, 751 N.E.2d 946. Thus, although error, the presence of the alternate jurors failed to constitute *prejudicial* error.

{¶134} But the instant case is distinguishable from *Jackson* and *Murphy*. Here, Gross's trial counsel *did* object to the presence of the alternate jurors in the sentencing deliberations.[6] And here the record contains indicia of participation by alternate jurors that create a presumption of prejudice that the state has failed to rebut.

{¶135} As we noted in *Murphy*, 91 Ohio St.3d at 533, 747 N.E.2d 765, the United States Supreme Court has explained that "[i]n theory, the presence of alternate jurors during jury deliberations might prejudice a defendant in two different ways: either because the alternates actually participated in the

---

6. In her separate opinion, Justice Resnick attempts to discredit defense counsel's objection, stating that "[a]lthough appellant did raise on the record an objection to the alternate jurors' presence in penalty-phase deliberations, the circumstances surrounding that objection * * * show that it was made in passing and was not emphasized." In the absence of authority for the concept that an objection lodged without sufficient *vigor* justifies a court's deeming it forfeited, we must discount the dissenting view. Likewise, in light of the objection, we dismiss the suggestion that Gross had somehow acquiesced in the presence of the alternate jurors.

deliberations, verbally or through 'body language'; or because the alternates' presence exerted a 'chilling' effect on the regular jurors." *Olano*, 507 U.S. at 739, 113 S.Ct. 1770, 123 L.Ed.2d 508. Courts have construed the foregoing *Olano* language to mean that "evidence that an alternate juror participated in jury deliberations is sufficient to demonstrate prejudice." *Manning v. Huffman* (C.A.6, 2001), 269 F.3d 720, 726. See, also, *United States v. Acevedo* (C.A.11, 1998), 141 F.3d 1421, 1424 ("[*Olano*] implied that once the alternate participates in any way—whether through words or gestures—prejudice is manifest"); *United States v. Ottersburg* (C.A.7, 1996), 76 F.3d 137, 140 (court conducted plain-error inquiry in case where alternates signed the jury form and explained that "the substantive participation of the alternates, once established, is sufficient to establish prejudice").[7] But, see, *United States v. Myers* (C.A.4, 2002), 280 F.3d 407, 412.

{¶136} Once Gross objected to the presence of the alternates in jury deliberations, the burden shifted to the state to demonstrate an absence of prejudice. Cf. *Olano*, 507 U.S. at 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (discussing the government's burden under Fed.R.Crim.P. 52[a]); Crim.R. 52(A). The state has failed to demonstrate the absence of prejudice, while Gross has pointed to specific evidence that at least one alternate inserted himself into the actual deliberations through intrusive verbal participation, while more than one alternate participated through nonverbal acts. We cannot say that the last note from the jury foreman—the one in which he stated that the jurors whom the alternates accused of being pressured "did not feel that way"—cures either the involvement of the alternate set forth in the preceding note or the nonverbal acts of the alternates relayed through the bailiffs' testimony. Once the problems became known, the trial court needed

---

7. Justice Resnick's dissenting analysis misses the distinguishing factor in *Acevedo*–that the court of appeals found no prejudice in that case because, *unlike here*, the ultimate verdict was the result of deliberations that were separate from the deliberations contaminated by the alternate jurors.

to inquire about the extent and effect of the alternates' participation. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 734 N.E.2d 1237 (trial court conducted searching inquiry of juror to ascertain whether misconduct occurred and whether juror fully understood breadth of her duty and implications of polling *prior* to accepting jury verdict and polling jury).

{¶137} Accordingly, we conclude that reversible error occurs where, over objection, an alternate juror participates in jury deliberations resulting in an outcome adverse to a defendant and either (1) the state has not shown the error to be harmless, or (2) the trial court has not cured the error. Here, we find specific evidence of active disruption of the deliberative process that poses a significant risk of affecting jury functions—a risk that carries presumptive prejudice that the state has failed to counter. Further, the trial court accepted the jury's verdict regarding the death sentence without making any attempt to cure the apparent error.[8] See *Acevedo*, 141 F.3d 1421 (trial court placed under seal the verdict in which alternate jurors participated, gave curative instruction, and had jurors redeliberate without alternates). Such unaddressed evidence of disruption carries a presumption of prejudice.

{¶138} We further note that the polling of the jury fails to remove the substantive due process concerns. When polled, each juror confirmed only that the death sentence recommendation was his or her verdict. Without more—such as the actions by the trial court in *Hessler* before the verdict in that case was reached— we cannot say that the polling here equates to an affirmation that each juror arrived at his or her verdict free from the improper influence of the alternates. We are therefore confined to recognizing that in this case the substantive verbal and

---

8. Because the trial court and counsel refer to the jury's sentencing recommendation as a "verdict," we use those terms interchangeably here. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 116, 734 N.E.2d 1237, fn. 2.

potentially substantive nonverbal involvement by the alternates establishes prejudice.[9]

{¶139} To conclude otherwise would be to identify an error without recognizing means to determine whether prejudice occurred. This is because we cannot now determine, for example, that the alleged physical act intrusions—the inexplicable pen throwing—exerted a chilling effect on the jury deliberations, or even constituted implicit threats against jurors, because a majority of this court has foreclosed fruitful inquiry in that regard by preventing a trial court from examining the alternate jurors following receipt of the verdict. See *Hessler*, 90 Ohio St.3d at 123, 734 N.E.2d 1237 (considering alternate juror part of the jury for purposes of the aliunde rule), following *State v. Reiner* (2000), 89 Ohio St.3d 342, 731 N.E.2d 662, paragraph two of the syllabus ("Evidence received from an alternate juror, without other outside evidence, is insufficient *aliunde* evidence under Evid.R. 606[B] upon which a court may rely in order to conduct an inquiry of other jurors into the validity of a verdict"), overruled on other grounds (2001), 532 U.S. 17, 121 S.Ct. 1252, 149 L.Ed.2d 158. But, see, *Reiner*, 89 Ohio St.3d at 360-361, 731 N.E.2d 662 (Cook, J., concurring in part and dissenting in part) (expressing the view—prior to adhering to stare decisis in *Hessler*—that "the testimony of a discharged alternate juror is not categorically insufficient *aliunde* evidence for purposes of Evid.R. 606[B]"). This and the presumed actual prejudice remove us from the realm of *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (holding that when improper contacts with a jury are discovered after a verdict, the trial court must hold a hearing to ascertain the effect of those contacts).

{¶140} The extant question then becomes what remedy we must apply. Because the error is related only to *sentencing* and not to *guilt*, we reject Gross's

---

9. Justice Resnick states that "[t]he lead opinion, by not placing the trial judge's decisions in proper perspective, portrays the practice as more extreme and unjustified than it actually was at that time." Yet, even *understandably committed* legal error entitles an aggrieved party to correction of the error.

contention that he is entitled to a new trial. We conclude instead that we must vacate Gross's death sentence and remand this cause for resentencing.[10] Cf. *State v. Campbell* (2000), 90 Ohio St.3d 320, 738 N.E.2d 1178.

### B. Moot Issues

{¶141} Our remand for resentencing moots Gross's ninth, tenth, fifteenth, sixteenth, and seventeenth propositions of law. These propositions addressed the effect of duplicative aggravating circumstances on the weighing process, the sentencing-phase jury instructions, the effect of alleged cumulative errors that included the foregoing sentencing-phase errors, the appropriateness of the death sentence in this case, and this court's proportionality review, respectively. Also moot is Gross's eighteenth proposition of law, which challenged Ohio's death-penalty scheme on numerous constitutional grounds.

---

10. In Section IV of her opinion, Justice Resnick attempts to take us to task for expressing no opinion on the merits or lack thereof of *hypothetical* ex post facto or retroactivity challenges to application of R.C. 2929.06(B) on remand. We do not opine on the issues because no party has raised these points of law, and in fact no party *could* raise them, given that no court has applied the statute to Gross.

V. Conclusion

{¶142} We find that alternate juror misconduct necessitates that we vacate Gross's sentence of death. Having found no prejudicial error in regard to Gross's convictions or remaining sentences, the judgment of the court of appeals is otherwise affirmed in all respects. The cause is hereby remanded for resentencing.

Judgment accordingly.

MOYER, C.J., and DOUGLAS, J., concur in judgment only.

PFEIFER, J., concurs in part and dissents in part.

RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

_____

**DOUGLAS, J., concurring in judgment only.**

{¶143} I respectfully concur only in the judgment. Crim.R. 24(F), both before and after amendment, required that the alternate jurors should have been discharged when the actual sworn jury retired to deliberate. The rule was not followed and this, in and of itself, was error. Given the clear dictates of the rule, nothing more needs to be said.

MOYER, C.J., concurs in the foregoing opinion.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶144} As I stated in *State v. Murphy* (2001), 91 Ohio St.3d 516, 564, 747 N.E.2d 765 (Pfeifer, J., dissenting), "allowing alternate jurors to be present during jury deliberations violate[s] the sanctity of the jury process. See *United States v. Virginia Erection Corp.* (C.A.4, 1964), 335 F.2d 868, 872; *Koch v. Rist* (2000), 89 Ohio St.3d 250, 252, 730 N.E.2d 963, 965." As the lead opinion explains, the juror misconduct that occurred during the penalty phase of this trial justifies a reversal of the death sentence. Accordingly, I concur with that part of the lead opinion.

{¶145} Whether there was juror misconduct during the guilt phase of the trial is less obvious, primarily because counsel unaccountably did not raise the issue. What we do know is that the same alternate jurors who disrupted the penalty phase of the jury deliberations were present throughout the guilt-phase deliberations.

{¶146} In *Koch*, despite the absence of specific factual allegations of misconduct, this court upheld a trial court's grant of a mistrial based on an alternate juror's presence in the deliberation room. Id., 89 Ohio St.3d 250, 730 N.E.2d 963. We so held because the alternate juror was present throughout the deliberations, because of the possibility of nonverbal communication, and because of the difficulty of determining whether the alternate juror prejudiced the jury. Id. at 252, 730 N.E.2d 963. The same factors apply to this case, in the extreme. Here, five alternate jurors were present throughout deliberations. Any of the five could have engaged in nonverbal communication, and determining whether the jury was prejudiced is exceedingly difficult, especially at this time. Further, since Crim.R. 24(F)(2) provides that "[n]o alternate juror shall be substituted during any deliberation," the presence of the alternate jurors in the deliberations could have served no useful purpose. I believe that the sanctity of the jury was violated during the guilt-phase of the deliberations. Accordingly, I dissent from the portion of the lead opinion that affirms the appellant's conviction.

_____

**RESNICK, J., concurring in part and dissenting in part.**

{¶147} I concur in the affirmance of appellant's convictions. However, I disagree with the determination that appellant's death sentence must be vacated and this matter returned to the trial court for resentencing. Specifically, I believe that the record does not contain evidence of improper alternate-juror behavior of the type necessary to raise a presumption of prejudice. Moreover, the record does not

reveal indicia of improper alternate juror behavior sufficient to support a finding of actual prejudice to appellant.

{¶148} The conclusion that the death sentence should be vacated is purely speculative and is a result of the lead opinion's failure to place the narrow incidents focused on to support a supposed presumption of prejudice within the context of a long, emotionally charged and complex death-penalty trial. When viewed from a perspective based on the trial as a whole, it is apparent that no prejudice occurred. Therefore, I vigorously dissent, not only because the facts of this case necessitate it but also because affirmance on this issue is supported by case law and applicable legal standards.

{¶149} Crim.R. 52(A) provides, "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In *United States v. Olano* (1993), 507 U.S. 725, 737, 113 S.Ct. 1770, 123 L.Ed.2d 508, a case implicating Fed.R.Crim.P. 52(b), the United States Supreme Court observed that "[t]he presence of alternate jurors during jury deliberations is not the kind of error that 'affect[s] substantial rights' independent of its prejudicial impact." Because there is no prejudicial impact, we should affirm the judgment of the court of appeals and go on to resolve the other issues found moot.

{¶150} The lead opinion attempts to articulate standards for its analysis based on a presumption of prejudice and a resulting burden on the state to rebut the presumption. However, due to the inherently speculative nature of the entire inquiry, since jury deliberations are confidential and conducted in secrecy, the state will virtually never be able to rebut a presumption of prejudice. Therefore, as a practical matter, there is no difference between a presumption of prejudice and actual prejudice in these types of cases. The standard the lead opinion sets forth, based on an apparent presumption of prejudice, is actually tantamount to a standardless inquiry into actual prejudice, and becomes little more than "we know

it when we see it" or perhaps, "we think we know it when we think we see it" due to the lack of any concrete evidence of what actually occurred.

**{¶151}** The lead opinion appears to discount the significance of the answers the jurors gave when they were individually polled after determining to recommend a death sentence. The polling gave each juror a clear opportunity to state any disagreement with the jury's final decision, and each juror distinctly stated that a death sentence was his or her true verdict. The jurors' answers in polling significantly weaken any presumption of prejudice that might attach to the deliberation proceedings and also make it apparent that no actual prejudice occurred.

**{¶152}** Defense counsel did not enter on the record an objection to the alternates' presence at the guilt-phase deliberations. Furthermore, counsel waited to object on the record until after the sentencing deliberations had already commenced. This could be viewed as substantial acquiescence in the practice the lead opinion focuses on in its search for prejudice. The lead opinion fails to grasp that the reasons for this acquiescence must be comprehended to place the essence of appellant's objection in its proper context.

**{¶153}** Similarly, the trial judge's decisions in this case to allow alternates to sit in on deliberations at both phases of the trial should not be considered in a vacuum. Those decisions must be analyzed from a perspective that recognizes that the approach taken by the trial judge in this case was by no means unique and was consistent with the approach being taken at the time of this trial by many other trial judges. The lead opinion's impercipient analysis verifies the old adage that "hindsight is 20/20" in that the lead opinion totally fails to appreciate that only very recently has the extent of this practice come to light. The lead opinion's failure to appreciate the actual setting of the trial leads it to the inevitable and almost preordained conclusion that prejudicial error must have occurred.

{¶154} For the specific reasons that follow, a close scrutiny of the entire trial record evinces insufficient evidence of prejudice, either presumed or actual, to require reversal.

I

Alternate-Juror Misconduct

{¶155} The lead opinion begins its consideration of the section of its opinion titled "Alternate-Juror Misconduct" with the statement that "Gross asserts in his fourteenth proposition of law that the trial court erred in not declaring a mistrial or granting a new trial based on the participation of alternate jurors in the penalty-phase deliberations." However, this statement is misleading, since the fourteenth proposition, as reproduced in the Appendix to the opinion, actually reads: "A capital defendant is entitled to a fair and reliable determination of his guilt and sentence by a jury that is properly instructed and that follows the court's instructions. Where the jury ignores the court's admonitions and discusses the case outside of the jury room and where jurors intimidate other jurors there is a denial of due process and a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, as well as Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution."

{¶156} In framing the alternate-juror issue in a way that best suits its own agenda, the lead opinion recasts this proposition to facilitate its analysis. There are several problems with this approach.

{¶157} In this fourteenth proposition of law, as in the fourteenth assignment of error raised in the court of appeals, appellant makes a claim that is generally based on juror misconduct. This claim does not focus on the presence of alternate jurors in deliberations but rather on the alleged misconduct of individual regular jury members, and not the alternates. In turning this proposition into one based on alternate juror misconduct in penalty-phase deliberations, the lead opinion uses it to justify placing a burden on the state to demonstrate an absence of prejudice — a

burden that the lead opinion finds the state was unable to meet. However, because the issue has never been articulated in this manner, the state never had an opportunity to meet this burden. The lead opinion announces for the first time that the burden is on the state and then faults the state for failing to meet its burden of proof on a question that the state did not even know was being raised. The way appellant *actually* raises this issue, along with a consideration of all relevant events that occurred at trial, reinforces the view that no prejudicial error is present in this case. That conclusion is further reinforced by an inquiry into the reasons the alternates were in the jury room in the first place, discussed later in this opinion.

{¶158} Furthermore, the federal cases cited by the lead opinion for its determination that prejudice is presumed in this case are distinguishable, since they focus on the actual substantive participation of alternates in deliberations, through such actions as signing a jury form. In light of the fact that appellant's argument in proposition of law number fourteen focuses on general juror misconduct and not specifically on the substantive participation of alternate jurors in deliberations, this case should be evaluated under an "actual prejudice" standard, and should not give rise to a presumption of prejudice.

{¶159} Finally, even where alternates substantively participate in deliberations, the federal courts have not been as inclined to find prejudice and to overturn guilty verdicts as the lead opinion seems to indicate. In *United States v. Acevedo* (C.A.11, 1998), 141 F.3d 1421, 1422-1423, the trial judge forgot to dismiss two alternates when the jurors retired to deliberate the defendant's guilt, and the alternates fully participated in the deliberations and joined in a unanimous verdict of guilty composed of 14 votes. When the problem came to light, the trial judge sealed that verdict without reading it, dismissed the two alternates, gave curative instructions, and sent the jury of 12 regular jurors back to deliberate again. After only five minutes of deliberations, the jury returned a guilty verdict. On appeal, despite this obviously active and full participation by the alternates in the

first deliberations, the court actually *upheld* the defendant's conviction, finding insufficient prejudice to justify reversal. The court did not speculate on the influence the alternates may have had on the jury during deliberations, as the lead opinion seems to do. Even though the lead opinion in the case sub judice cites *Acevedo*, 141 F.3d at 1424, for the proposition that "[*Olano*] implied that once the alternate participates in any way—whether through words or gestures—prejudice is manifest," it is apparent that the *Acevedo* court did not find the prejudice to be sufficiently manifest in the situation it reviewed to reverse the conviction. The *Acevedo* court upheld the conviction despite the fact that the alternates' participation in that case was active and not subtle, unlike the alleged "participation" in this case.

## II

### Proceedings at Trial

{¶160} Events earlier in the trial are relevant to the issue the lead opinion considers to be confined to the penalty phase. The alternates involved in the incidents cited by the lead opinion were not strangers to the twelve members of the jury. The alternates, along with the jury members, were part of an extensive voir dire to seat a jury, and they listened to the testimony of witnesses and sat through detailed presentations of evidence and arguments in the guilt phase of the trial, sat in on deliberations in the guilt phase without objection, heard evidence and arguments in the penalty phase of the trial, and sat in on deliberations at the penalty phase.

### A

{¶161} The parties and the judge painstakingly endeavored to seat an impartial jury. Voir dire covered eleven days and makes up approximately 2,500 pages of transcript in the record. The ensuing trial in this case was lengthy, with the state presenting numerous witnesses and the defendant calling several as well. The guilt phase of the trial started on July 30, 1996, and lasted ten days, concluding

on August 12, 1996. When the trial judge addressed the 12 members of the jury and the five remaining alternates prior to deliberations in the guilt phase on August 12, 1996, at the close of the evidence and arguments, the judge cautioned the jurors not to surrender their "honest convictions" for the sake of simply arriving at a verdict.

{¶162} At that point, the judge specifically mentioned the five alternates, and stated that they would be going into the jury room with the 12 jurors. He instructed the alternates to "in no way" participate in deliberations, told them several times that they were to listen and watch only, and counseled that "under no conditions are you to engage in any conversations during these deliberations." The jury was then sent to the jury room to deliberate. There is no evidence anywhere in the record that the defense attorney objected to the presence of alternates in guilt-phase deliberations, although the defense attorney raised various other issues through objections at that time.

{¶163} The jury deliberated from 3:23 p.m. to 5:40 p.m., less than two and one-half hours, and reached its findings of guilty on all charges. All five alternates and 12 jurors were present in the courtroom as the jury verdicts were announced. The jury was polled on each charge, and all 12 jurors individually stated that their verdict on each count was "guilty." After the jury was polled, the trial judge informed the five alternates that they would be returning as alternates in the penalty phase. There is no evidence in the record at this point in the proceedings of any misconduct or inappropriate behavior by any jury member or alternate juror.

{¶164} On August 19, 1996, the trial judge held an afternoon session with the attorneys for both sides to put on the record earlier discussions of motions relating to the penalty hearing, which was to start the next day. No participant in this session raised any issue regarding alternate jurors on the record.

{¶165} The sentencing phase began on August 20, 1996. Before the jury came in, some matters from the day before were entered on the record. Also,

appellant's nephew was sworn in to testify about his claim that he had overheard a juror talking about the case a few days before the guilty verdict and that the juror implied that he had already formed the opinion that appellant was guilty. The juror denied that he had said anything improper, and the trial judge refused to remove him as a juror. The jury was then brought in, and the mitigation evidence and testimony, as well as appellant's unsworn statement, were presented for the rest of the day's session.

{¶166} On August 20, 1996, the defense attorney submitted proposed jury instructions for the sentencing phase, stating that appellant did not "waive or withdraw his objection to sending the alternate jurors back into the jury room during deliberations with the twelve regular jurors." Although this statement implies that an objection had already been made, this appears to be the first time the record contains any indication of any objection over the presence of alternates during deliberations.

{¶167} The second day of the penalty phase began the morning of August 21, 1996. Outside the presence of the jury, several matters were discussed for the record, none of them relating to alternate jurors. The jury came in and closing arguments were held. The trial judge then instructed the jury for its penalty-phase deliberations. Again, as in the guilt phase, he told them not to surrender their "honest convictions" simply to reach a verdict. The five alternate jurors were told that they would retire to the jury room with the jury, and the trial judge instructed them in clear terms that they were not to participate in deliberations and were to listen and watch only.

{¶168} The penalty-phase deliberations started at 10:59 a.m., and there was later a break for lunch. There were still no objections made on the record to the alternates in the jury room at this point. At 1:26 p.m., shortly after the lunch break ended, the jury foreman sent a question to the judge asking whether the alternates were allowed to play cards during deliberations. The trial judge responded "[N]o."

The jury foreman then sent a question out at 1:59 p.m. regarding the sentencing forms, and the trial court answered it. Then, there were some discussions on the record among the judge, the defense attorney, and the prosecutor, with the defense attorney stating that he wanted to get some things on the record that had been discussed with the prosecutor and the judge, apparently off the record, in the last few days. At this point, in the middle of several other matters not relevant to the alternate-juror issues, the defense attorney stated, with no elaboration, and with no comment on the point by either the judge or prosecutor, "I also object to sending the alternates back into the deliberation room, which was done here." At the close of the defense attorney's recitation of all the issues he raised, the trial judge stated, "Overrule everything." This terminated the discussion without specifying any details on any point being denied.

{¶169} At 3:31 p.m., the jury foreman passed a question to the judge: "One alternate is expressing his feelings about the other jurors in a manner that he thinks isn't right. Everyone is really tense about this. He feels things are going wrong and thinks some people are getting pressured in making decisions. It's to the point he thinks it [sic] wrong. I on the other hand feel no one has been swayed by force." Shortly thereafter, two bailiffs were sworn in and questioned on the record about conversations with the jury foreman. One bailiff stated that the jury foreman had knocked on the door at 3:25 p.m. and told him, "It's getting out of hand in here, the alternates are throwing pens and thing[s]." The bailiff testified that he told the foreman to put it in writing and knock on the door again.

{¶170} The specific statement about throwing pens apparently never was put in writing, but the note about the alternate expressing his feelings appears to have been a result of the conversation between the bailiff and the jury foreman. Based on the note and the bailiffs' statements, the trial judge made a decision to bring the jurors into the courtroom to instruct them again, remarking that tension runs high in a trial like this.

**{¶171}** Before the jurors could be returned, the foreman sent out a note at 3:52 p.m.: "Both people that were accused of being 'pressured' by the alternate told me when asked if they were pressured, that they did not feel that way. We have come to a decision." Before the jury came in, the judge told the courtroom spectators that it would be an emotional moment when the jury's decision was announced, and cautioned them to control themselves.

**{¶172}** At 3:59 p.m., the jury was brought in, along with the five alternates, and the jury's recommendations of death on both counts were announced. The jury was polled, as it was at the end of the guilt phase, with each individual juror verifying that it was his or her verdict that a death sentence should be imposed on appellant. The trial judge thanked the jury for its service, observing that they had deliberated "some three and a half hours" and remarked that it had been a difficult case. He specifically expressed his appreciation to the alternates for their efforts and also thanked them for their "patience" and "courtesy." The jury was then finally dismissed.

**{¶173}** On October 18, 1996, the trial judge held a hearing on a motion for a new trial filed by appellant. Among the issues raised in that motion, filed August 30, 1996, were several relating to alleged juror misconduct. The judge dismissed that part of the motion because no supporting affidavits were supplied.

B

**{¶174}** The preceding facts reveal much about the trial beyond the narrow confines the lead opinion focuses on. This was a high-profile case involving the cold-blooded killing of a deputy sheriff (with two of the shots fired point blank into the victim's head) and tensions were running high. As in any case where the death penalty is sought, the jury felt the weight of its responsibility. It is eminently understandable that individuals could have trouble controlling their emotions in these circumstances. The lead opinion's myopic view of the record ignores the overall setting surrounding the trial.

{¶175} Although appellant did raise on the record an objection to the alternate jurors' presence in penalty-phase deliberations, the circumstances surrounding that objection, as indicated above, show that it was made in passing and was not emphasized. The lead opinion keys on the fact that there was an objection to the practice in this case to distinguish it from similar cases finding no plain error when no objection was raised. However, although appellant did technically raise an objection at trial, it is apparent from the relevant proposition of law and associated briefing that appellant on appeal has not targeted the presence of alternate jurors in penalty-phase deliberations as a basis for reversal, probably because of the way courts were applying the law on this issue at the time appellant's brief was filed, which was before this court's decision in *State v. Murphy* (2001), 91 Ohio St.3d 516, 747 N.E.2d 765.

{¶176} Moreover, by not objecting to the presence of alternates in the earlier guilt-phase deliberations, appellant had already acquiesced in a practice that he formally objected to on the record only after penalty-phase deliberations had begun. In addition, appellant filed no written motion specifying the reasons for the objection to alternates in penalty-phase deliberations. While the record does indicate that some oral discussion of this issue with the trial judge must have taken place off the record, it is impossible to discern whether appellant argued the specifics of the issue to the trial judge. All that appears in the record is a bare objection unsupported by any legal reasoning with no citation of any criminal rule or case law. In light of appellant's earlier acquiescence in allowing the alternates to sit in on guilt-phase deliberations, and the perfunctory manner in which the objection was presented, it was not surprising that the trial court overruled the objection at the penalty phase.

{¶177} It does not appear at all clear that there was any activity that could be described as "participation" that is prejudicial to a defendant by the alternates detailed in the record of this case. The cryptic notes written by the jury foreman

and the statements relayed by the bailiffs reveal very little that could be actually termed participation. It seems clear that alternates who are playing cards and throwing pens are not by those acts participating in deliberations. In the absence of further elaboration on those activities, it seems fruitless to speculate one way or the other on the impact those actions might have had on the deliberations of the jury.

{¶178} Although an alternate was expressing his feelings about some jurors being pressured in deliberations, the record of course does not show any details, such as whether these sentiments were conveyed during a break or during the heat of the deliberations. In addition, the substance of the alternate's allegation was that *others* in the jury room (the regular jurors themselves) were being pressured; there is no indication that this alternate was participating in deliberations beyond expressing the view that others were (as the statement was relayed by the jury foreman) "getting pressured."

{¶179} While it is apparent that this alternate was thus violating the trial judge's instructions "to listen and to watch only," the alternate's "participation" in this case is not of the type that should lead to a presumption of prejudice or the reversal of the death penalty. Due to the aliunde rule, Evid.R. 606(B), which clearly should apply to *any* juror (whether regular or alternate) who is present in the jury room during deliberations despite the lead opinion's protracted discourse to the contrary, any inquiry into what actually went on is foreclosed. But, if we are going to speculate through applying an unanswerable presumption of prejudice, for all we know the alternate may have been against the death penalty and may have considered statements in favor of it as "pressuring" undecided jurors.

{¶180} There is nothing in the record indicating that the jurors themselves felt pressured, and there are significant indications that they did not. The jury foreman's note regarding the alternate expressing his feelings reveals the foreman's view that no one was being swayed, and the final note sent out by the foreman

reveals that the jurors did not feel pressured. The trial judge, who presided over this long and involved trial, made some inquiries and was satisfied that no undue pressure was asserted. The jury was polled after the verdicts of death were reached, and each juror verified that his or her vote was for recommending the death sentence.

{¶181} While it may have been preferable to question individually each juror and alternate in more detail at this point, the failure to do so was not error in these circumstances. The trial court's focus at this time was on whether there was misconduct or improper influence on the jury as a whole. It is true that the alternate jurors in the jury room, like the jurors, played some role owing to their presence in the jury room in the overall inquiry into jury misconduct. However, there were no specific reasons for the court to inquire into whether the alternates, by their mere presence in the jury room, had contaminated the deliberations, and appellant's complaints at the time were not directed at that question. Appellant's fourteenth proposition of law approaches this entire situation in the same way that the trial judge did at the time the scenario actually unfolded. The lead opinion drastically departs from that scenario in evaluating this proposition of law.

{¶182} Finally, the alternates had been present at all previous stages of this trial and appellant raised no complaints on the record about their behavior until the series of events at the penalty-phase deliberations. Anyone who has been present at or participated in an aggravated murder trial involving death specifications can readily appreciate the stress that was present during this final stage of the proceedings, and we should not be too hasty to presume prejudice merely because emotions were running high. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 120, 734 N.E.2d 1237 (heightened emotions and intense feelings are part and parcel of the jury-deliberation process).

## III

### Alternate Jurors' Presence in Deliberations

**{¶183}** The lead opinion does not delve into the specifics of why the alternates were in the jury room, and thus does not explain the implications of former Crim.R. 24(F) and this court's opinion in *State v. Hutton* (1990), 53 Ohio St.3d 36, 559 N.E.2d 432, on the issue it reverses. A consideration of former Crim.R. 24(F) and *Hutton* is essential to understand this case.

**{¶184}** As the lead opinion recognizes, former Crim.R. 24(F) required on its face that alternate jurors must be discharged when the jury retires. See *State v. Murphy*, 91 Ohio St.3d at 531, 747 N.E.2d 765, and *State v. Jackson* (2001), 92 Ohio St.3d 436, 438-439, 751 N.E.2d 946 (both of which found no plain error when alternate jurors sat in on deliberations and defendants failed to object). The lead opinion fails to note, however, that this rule was judicially modified as it applies to capital cases in *State v. Hutton*, 53 Ohio St.3d at 46-48, 559 N.E.2d 432, and paragraph three of the syllabus, to allow a trial judge to retain alternates after guilt-phase deliberations in case a regular juror becomes incapacitated before penalty-phase deliberations begin. See *Murphy*, 91 Ohio St.3d at 531, 747 N.E.2d 765 (citing *Hutton,* 53 Ohio St.3d at 46-48, 559 N.E.2d 432, and paragraph three of the syllabus).

**{¶185}** Crim.R. 24 has recently been amended, effective July 1, 2002, apparently to reflect the holding of *Hutton*. Crim.R. 24(F)(2) now reads:

**{¶186}** "Capital cases. The procedure designated in division (F)(1) of this rule shall be the same in capital cases, except that any alternate juror shall continue to serve if more than one deliberation is required. If an alternate juror replaces a regular juror after a guilty verdict, the court shall instruct the alternate juror that the juror is bound by that verdict. No alternate juror shall be substituted during any deliberation. Any alternate juror shall be discharged after the trial jury retires to consider the penalty."

**{¶187}** According to the Staff Note to amended Crim.R. 24(F), dealing with alternate jurors, "The amendment effective July 1, 2002 divided division F of the

previous rule into divisions (F)(1) and (F)(2). Division (F)(1) [Non-capital cases] contains the substance of previous division (F), plus the inclusion of an exception for capital cases. Division (F)(2) [Capital cases] was added to permit alternate jurors in capital murder cases to continue to sit as alternate jurors after a guilty verdict has been rendered. If an alternate juror replaces a regular juror for the penalty phase of the trial, the trial judge shall instruct the alternate juror that the alternate juror is bound by the guilty verdict." (Brackets sic.)

## A

### *State v. Hutton*

{¶188} It is apparent that *Hutton* generated a degree of confusion in both trial and appellate courts over its judicial modification of former Crim.R. 24(F) in capital cases. The specific issue in this case as the lead opinion approaches it — the propriety of alternate jurors being present in the jury room during deliberations — was a subject of much misunderstanding until this court's recent decision in *Murphy* offered some clarification. See 91 Ohio St.3d at 532, 747 N.E.2d 765 ("nothing in *Hutton* authorizes alternates who have *not* replaced regular jurors to be present during deliberations") (emphasis sic). It is impossible to grasp the extent of this misunderstanding without a detailed discussion of *Hutton*.

{¶189} A capital trial involves essentially four different definable stages: (1) guilt-phase presentation of evidence and arguments, (2) guilt-phase deliberations, (3) penalty-phase presentation of evidence and arguments, and (4) penalty-phase deliberations. Crim.R. 24(F), both before and after its recent amendment, authorizes alternate jurors to be present at the first stage. Former Crim.R. 24(F), since it provided simply that alternate jurors who do not replace regular jurors "shall be discharged after the jury retires to consider its verdict," on its face required that alternate jurors would not be present at any of the final three stages. If an alternate juror replaced a regular juror before the jury retired to

deliberate, that juror could be present at the final three stages, but it was as a regular juror, and no longer as an alternate.

**{¶190}** Recognizing that a capital case is different from other criminal cases, this court in *Hutton* held at paragraph three of the syllabus that former "Crim.R. 24(F) is not violated in a capital case where an alternate juror is substituted for another juror after the guilt phase verdict, but before deliberations begin in the penalty phase." 53 Ohio St.3d 36, 559 N.E.2d 432. With this holding, this court in *Hutton* authorized trial court judges to retain alternates in capital cases past the time that the jury retires to consider the guilt-phase verdict. There is no mention in the *Hutton* opinion of whether these alternates would sit in on, without participating in, the guilt-phase deliberations. It is impossible to tell from the *Hutton* opinion whether the alternate who was retained in that case had been present at the guilt-phase deliberations, although as will be discussed subsequently, it may be safe to presume that the alternate was not.

**{¶191}** To be precise, this court in *Hutton* was authorizing and upholding *only* the practice that occurred in the case before it, in which a juror was replaced with an alternate after the jury had found the defendant guilty and before the start of the penalty phase. Id. at 44-45, 559 N.E.2d 432. The extent of this court's ruling in *Hutton* was only that alternates could be present at the penalty-phase presentation of evidence and arguments in a capital case, and if an alternate juror replaced a regular juror at that stage, then that alternate could be present at and participate in deliberations at the penalty phase, but as a regular juror and not as an alternate.

**{¶192}** An important question in *Hutton* was whether an alternate who is retained while the jury reaches a guilty verdict in the guilt phase can be sufficiently familiar with the case that he or she is able to competently replace a removed juror who has fully participated in all proceedings to that point. If the alternate has not participated in deliberations at the guilt phase, there is some fear that the alternate cannot be as fully informed and functioning a member of the jury as the continuing

jurors. It is important to note at this point that there is a difference between *not participating in* deliberations and *being absent from* deliberations.

{¶193} *Hutton* did not specifically address the issue of alternate jurors sitting in on deliberations in either phase of a capital trial. However, a very close reading of *Hutton* reveals that this court's opinion included an assumption that alternate jurors in bifurcated cases who are retained after deliberations in the first phase begin would not be sitting in on deliberations in either phase.

{¶194} First, the *Hutton* opinion discussed *State v. Dodis* (Minn.1982), 314 N.W.2d 233, a murder case that under Minnesota law was bifurcated into a guilt phase and a mental-illness phase because the defendant raised mental illness as a defense. As the *Hutton* court contemplated the reasons for and against fashioning a specific exception to Crim.R. 24(F) for capital cases, it cited *Dodis* in support of the idea that alternates could be retained between phases of a bifurcated trial. The *Hutton* court characterized *Dodis* as finding that "[t]he alternate's absence from deliberations on guilt was 'of no consequence' to his ability to deliberate on mental illness." 53 Ohio St.3d at 46, 559 N.E.2d 432, quoting *Dodis*, 314 N.W.2d at 241.

{¶195} Second, in its discussion of *People v. Fields* (1983), 35 Cal.3d 329, 197 Cal.Rptr. 803, 673 P.2d 680, the *Hutton* court again implied that the alternate juror in a capital case who was retained once the first stage ended would *not* have been present in guilt-phase deliberations. As support for not allowing an alternate to become a juror at the penalty phase, the *Hutton* court cited *Fields,* which reasoned that such a juror would be joining a group that had already deliberated after the guilt phase, in which the group had conducted discussions and reached conclusions. The *Hutton* court observed that this alternate "would be 'ignorant of those discussions and conclusions.' " 53 Ohio St.3d at 46, 559 N.E.2d 432, quoting *Fields* at 351, 197 Cal.Rptr. 803, 673 P.2d 680. Obviously, if the alternate had sat in on guilt-phase deliberations, the alternate would not be "ignorant" of what went on during those deliberations.

{¶196} Despite the inferences in *Hutton* that seem clear to us now in hindsight, it is an indisputable fact that many trial court judges relied on *Hutton* as authorization for alternate jurors in capital cases to sit in on deliberations, both at the guilt phase and the penalty phase, and that this view of *Hutton* was taken by the trial court judge in the instant case. See, e.g., *State v. Jackson*, 92 Ohio St.3d at 438-440, 751 N.E.2d 946 (practice was not plain error); *State v. Murphy*, 91 Ohio St.3d at 531-533, 747 N.E.2d 765 (same); *State v. Hessler*, 90 Ohio St.3d at 123, 734 N.E.2d 1237 (alternate sat in at deliberations but no objection at trial and defendant did not raise practice as error on appeal); *State v. Henness* (1997), 79 Ohio St.3d 53, 72, 679 N.E.2d 686 (apparently no objection at trial; proposition of law challenging practice summarily rejected, id. at 56, 679 N.E.2d 686); *State v. Voorhies* (June 14, 1995), Guernsey App. No. 94-CA-8 (finding, based on *Hutton*, Crim.R. 24[F] not applicable to capital murder case, so no error when trial judge allowed alternate jurors to be present at guilt-phase deliberations in capital case in which jury did not recommend death penalty). The fact that this was a common practice perhaps was why the defense attorney in the instant case did not object to the presence of alternates during guilt-phase deliberations. In addition, defense attorneys in cases such as *Jackson* and *Murphy* did not object to the presence of alternates in deliberations at either phase.

{¶197} It was not until 2001 in *Murphy* that this court definitively found that the practice was error. Perhaps judges presiding over jury trials in the time between *Hutton* and *Murphy* reasoned that if the alternate was not allowed to sit in on guilt-phase deliberations, it would be too difficult for the alternate to fully participate at the penalty phase if called to replace a juror. Although such an approach would be inconsistent with the *Hutton* court's discussions of *Dodis* and *Fields* detailed above, there is other language in *Hutton* that could be interpreted to support that approach. For example, *Hutton* stated that "the *Fields* court 'recognize[d] that unforeseen circumstances may require substitution of a juror at

68

the penalty phase of a capital trial, even though the alternate did not take part in the guilt phase deliberations.' " 53 Ohio St.3d at 47, 559 N.E.2d 432, quoting *Fields*, 35 Cal.3d at 351, 197 Cal.Rptr. 803, 673 P.2d 680, fn. 9, citing *People v. Green* (1971), 15 Cal.App.3d 524, 528, 93 Cal.Rptr. 84. If a trial judge failed to appreciate the difference between "not taking part" in deliberations and "not being present" at deliberations, this passage, read in isolation, could support a view that alternates could be present at deliberations without taking part in them.

{¶198} Or perhaps the scope of *Hutton'*s holding on this issue was misunderstood. In *Voorhies*, the court of appeals stated that in *Hutton*, this court set forth "reasons why it would not be appropriate to apply Crim.R. 24(F) to a capital murder case," and proceeded to find that former Crim.R. 24(F) did not apply to capital cases, by virtue of *Hutton*. That interpretation failed to appreciate that *Hutton* merely established a narrow exception to Crim.R. 24(F), and certainly not a carte blanche authorization to ignore the rule totally in capital cases.

{¶199} The court of appeals' decision in *Voorhies,* along with the trial scenarios in cases such as *Murphy* and *Jackson,* illustrate that it was a common practice to allow alternate jurors to sit in on jury deliberations in capital cases at the time the instant trial took place. Thus, the instant trial is clearly distinguishable from trials that have occurred since *Murphy* was decided. The lead opinion, by not placing the trial judge's decisions in proper perspective, portrays the practice as more extreme and unjustified than it actually was at that time. The lead opinion's presumption of prejudice is similarly distorted because much of the lead opinion's apparent insight into this issue is based on this court's observations in *Murphy* and *Jackson*, both of which were decided long after the trial in the instant case took place.

{¶200} Current Crim.R. 24(F)(2), as amended, makes clear that alternate jurors in a capital case are to be discharged when the jury retires to consider its verdict in the penalty phase. I believe that this part of Crim.R. 24(F)(2) is not

inconsistent with the rule exception announced in *Hutton*. Therefore, since the proper view of alternates' positions in capital cases has not changed, the trial judge in this case erred in allowing alternates to sit in on jury deliberations.

{¶201} However, one of the most compelling rationales behind *Hutton* was that, if no exception were made to former Crim.R. 24(F) for capital cases, discharging alternates after the guilt phase "would completely foreclose the state from obtaining the death penalty" if a regular juror became unable to serve in the penalty phase. See 53 Ohio St.3d at 47, 559 N.E.2d 432. But, see, R.C. 2929.06(B), as amended effective September 21, 1996. While *Hutton,* and now amended Crim.R. 24(F)(2), provide a procedure for replacing a juror with an alternate before penalty-phase deliberations, the problem remains that, if a juror becomes unable to serve after penalty-phase deliberations begin, the jury must be dismissed. *Hutton* of course did not involve this scenario, and so that case did not consider it.

{¶202} As will be discussed below, the Federal Rules of Criminal Procedure now address the replacement of a juror with an alternate during deliberations (although there is no special federal rule for bifurcated cases, see *United States v. Johnson* [C.A.7, 2000], 223 F.3d 665, 670; *United States v. Webster* [C.A.5, 1998], 162 F.3d 308, 345-347). The approach of the Federal Rules on this point is worth considering, especially in bifurcated cases. There are significant advantages to retaining an alternate juror during deliberations at both phases of a capital trial, and to being able to substitute that alternate during deliberations if a regular juror becomes unable to serve, just as there are advantages to allowing substitution of an alternate during deliberations in a regular trial. Crim.R. 24(F)(2), which now provides that "[n]o alternate juror shall be substituted during any deliberation," specifically forecloses the possibility of substitution of an alternate during deliberations in a capital case.

{¶203} Amended Crim.R. 24(F)(2) does not specify where the alternates should be during the jury's deliberations in the guilt phase. In light of the obvious

70

confusion that *Hutton* has generated on this issue, it may have been preferable for the amended rule to clearly state that the alternates should not sit in on those deliberations, although they are not to be dismissed at that point. The alternates should be retained in a room separate from the jury and instructed not to discuss the case among themselves. But, even though the amended rule does not specifically say so, it is apparent that alternate jurors should not sit in on deliberations. This is a natural consequence of the exception to former Crim.R. 24(F) announced in *Hutton* and clarified in *Murphy* (as discussed above) and also fully consistent with the spirit of the recent amendment resulting in Crim.R. 24(F)(2).

B

Alternate Jurors and Federal Procedural Rules

{¶204} Both the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure have been modified to address problems sometimes presented by the use of alternate jurors. In civil jury trials in the federal system, the provisions for alternate jurors in former Fed.R.Civ.P. 47(b) were discarded in 1991. Fed.R.Civ.P. 48 provides:

{¶205} "The court shall seat a jury of not fewer than six and not more than twelve members and all jurors shall participate in the verdict unless excused from service by the court pursuant to Rule 47(c). Unless the parties otherwise stipulate, (1) the verdict shall be unanimous and (2) no verdict shall be taken from a jury reduced in size to fewer than six members." Ohio's Civil Rules retain the concept of alternate jurors in Civ.R. 47(C): "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Obviously, Fed.R.Civ.P. 48 gives a federal trial judge much more flexibility in seating a jury and proceeding through to a final verdict in a civil case than our Civil Rules give an Ohio trial judge.

**{¶206}** Two provisions in the Federal Rules of Criminal Procedure are relevant to this discussion. Fed.R.Crim.P. 23(b) allows a jury of fewer than 12 members to reach a decision if a trial judge dismisses a juror for just cause after deliberations have begun. Fed.R.Crim.P. 23(b) provides:

**{¶207}** "Jury of Less Than Twelve. Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than twelve should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors."

**{¶208}** For a collection of cases applying Fed.R.Crim.P. 23(b), see Annotation, Constitutionality and Application of Federal Rule of Criminal Procedure 23(b), Allowing 11-Person Jury to Return Verdict Absent Stipulation to that Effect by Parties When One Juror Has Been Excused After Start of Deliberations (1992), 107 A.L.R.Fed. 508. See, also, *United States v. Gambino* (C.A.3, 1986), 788 F.2d 938, 946-949, discussing the specifics of Fed.R.Crim.P. 23(b).

**{¶209}** In addition, effective in 1999, Fed.R.Crim.P. 24(c) was amended to specify a procedure whereby a trial judge can replace a juror with an alternate after deliberations have begun. Fed.R.Crim.P. 24(c)(3) provides:

**{¶210}** "Retention of Alternate Jurors. When the jury retires to consider the verdict, the court in its discretion may retain the alternate jurors during deliberations. If the court decides to retain the alternate jurors, it shall ensure that they do not discuss the case with any other person unless and until they replace a regular juror during deliberations. If an alternate replaces a juror after deliberations have begun, the court shall instruct the jury to begin its deliberations anew."

72

**{¶211}** A recent federal court of appeals decision serves to illustrate some features of the Federal Criminal Rules mentioned above. In *United States v. Register* (C.A.11, 1999), 182 F.3d 820, a criminal case involving federal drug trafficking and weapons charges, the trial judge did not dismiss the alternate jurors at the start of deliberations, as required by former Fed.R.Crim.P. 24(c) (and so violated the rule in effect at the time of trial), but instead ordered the alternates to wait in a separate room while the jury deliberated, instructing the alternates not to discuss the case among themselves. After deliberations had started, the trial judge dismissed one of the regular jurors and substituted an alternate, ordering the jury to begin its deliberations again. The jury then found the defendants guilty of some of the offenses they were charged on. The court of appeals applied a harmless-error test and affirmed the convictions because it found no prejudice to the defendants. Id. at 842-843.

**{¶212}** The *Register* court found that the trial did not violate Fed.R.Crim.P. 23(b), reasoning that that rule, by allowing for a jury of fewer than 12 to render a verdict, does not specifically foreclose the option of seating alternates during deliberations if the trial judge so decides. See id. at 843, fn. 34. The *Register* court also recognized that the proposed amendment to Fed.R.Crim.P. 24(c)(3), which had not yet been adopted at the time of trial, would have allowed a trial judge to employ exactly the procedure used by the trial judge in the case before it. Id. at 843, fn. 36. Thus, under the Federal Criminal Rules, the trial judge has the option of proceeding under Fed.R.Crim.P. 23(b) or 24(c) if a juror becomes unable to serve during deliberations. The flexibility afforded by these rules appears to be a worthwhile innovation.

**{¶213}** The federal system's modification of its rules, both civil and criminal, attempts to address problems presented by complicated and protracted jury trials. Whether civil or criminal, a lengthy jury trial presents special challenges that require more flexibility. The federal rules mentioned above, at least as they

relate to alternate jurors, address these special challenges, and Ohio should consider making similar revisions to our rules that implicate alternates, and to any related statutes, such as R.C. 2945.29.

{¶214} In *State ex rel. Columbus v. Boyland* (1979), 58 Ohio St.2d 490, 492-493, 12 O.O.3d 401, 391 N.E.2d 324, this court found that the Ohio Constitution does not require that a jury in a criminal case be composed of 12 persons. That decision may indicate that our Crim.R. 23 could be amended in line with the federal criminal rules to allow juries of fewer than 12 to deliver verdicts in some situations. Also, since our rules have no provision allowing for replacement of jurors during deliberations (a practice now specifically forbidden in capital cases by Crim.R. 24[F][2]), a long hard look at Fed.R.Crim.P. 24(c)(3) may be in order. At the same time, our state's recent amendment of Crim.R. 24(F), recognizing that capital cases merit specialized rules in this area, is noteworthy. Further refinements of procedures specific to capital cases would not be incompatible with the adoption of some of the federal innovations discussed above relating to alternate jurors for all criminal cases.

IV

Is the Death Penalty an Option on Remand?

{¶215} In vacating appellant's death sentence and remanding this cause to the trial court for resentencing, the lead opinion makes no mention of what should happen on remand, and therefore does not discuss whether appellant remains eligible to receive a death sentence. Specifically, the lead opinion does not address whether R.C. 2929.06(B) applies to this case. There are two possible views to take of the lead opinion's failure to cite that statute. One is that the lead opinion believes that it does not apply to appellant's case. The other is that, even though the lead opinion does not cite the statute, it does apply on remand. It is apparently up to the trial judge to determine which of these two views is the correct one.

{¶216} The General Assembly enacted R.C. 2929.06(B), effective in 1996, to require a trial court to seat a new penalty-phase-only jury in order to resentence an offender when an appellate court has vacated the original death penalty based on penalty-phase error in a jury trial death-penalty case. See 1996 Sub.S.B. No. 258, 146 Ohio Laws, Part VI, 10539, 10548. That statute specifically lists death as one of the options that is now available at resentencing. R.C. 2929.06(B) overruled this court's holding in *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744, syllabus, that death is not an option for resentencing in this situation, and answers the criticisms raised in Justice Holmes's dissent in *Penix* that a defendant should face a new sentencing-phase-only jury in that situation, in which the state may seek the death penalty. See 32 Ohio St.3d at 375-379, 513 N.E.2d 744 (Holmes, J., dissenting).

{¶217} It is apparent that, for the same reasons cited in Justice Holmes's dissent in *Penix*, Section (A) of R.C. 2929.06 does not apply to the case sub judice. See 32 Ohio St.3d at 375-376, 513 N.E.2d 744 (Holmes, J., dissenting). Since Section (A) does not apply, Section (B) does on its face and would seem to authorize the state to seek a death sentence on remand.

{¶218} The offenses appellant was convicted of were committed in 1994. On remand, an argument will surely be made that applying R.C. 2929.06(B), enacted two years after those offenses, would violate the constitutional prohibitions against ex post facto laws and retroactive laws. No cases of this court interpret R.C. 2929.06(B), even though it was first effective six years ago. Its reach is limited to a small number of cases. This case is one that seems to implicate all the conditions specified within the statute for its application. However, if it should violate prohibitions against ex post facto laws or against retroactive laws, R.C. 2929.06(B) would not apply.

{¶219} While a majority of this court has never addressed R.C. 2929.06(B), that statute has been cited in a dissenting opinion to support the apparent view that

the statute can be applied to a situation such as this. In *State v. Twyford* (2002), 94 Ohio St.3d 340, 763 N.E.2d 122, the offenses occurred in 1992, the jury recommended death, and the trial court imposed the death sentence. A majority of this court affirmed the death penalty. One justice authored a separate opinion, joined by another justice, expressing the view that the guilty verdict should be affirmed but the death penalty should be reversed. Id. at 368-372, 763 N.E.2d 122 (Lundberg Stratton, J., concurring in part and dissenting in part). The authoring justice reasoned that defense counsel's ineffectiveness in the guilt phase in soliciting inadmissible, highly inflammatory testimony about the defendant had a carryover effect on the jury in the penalty phase, thereby requiring reversal of the death sentence. Id. at 372, 763 N.E.2d 122. The opinion concluded with the statement that, instead of affirming the sentence of death, this court should "remand the cause for rehearing pursuant to R.C. 2929.06(B), which provides for the trial court to impanel a new jury for a new mitigation and sentencing hearing in which this evidence would be excluded." Id.

{¶220} Even though R.C. 2929.06(B) provides the options other than death that are available in this situation, i.e., life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years, and life imprisonment with parole eligibility after serving thirty full years, only those options available in 1994 may be imposed in this case. See *State v. Madrigal* (2000), 87 Ohio St.3d 378, 399, 721 N.E.2d 52; *State v. Raglin* (1998), 83 Ohio St.3d 253, 259-260, 699 N.E.2d 482, both considering the application of R.C. 2929.03, which was amended effective July 1, 1996. See 146 Ohio Laws, Part IV, 7136, 7454-7456, and 146 Ohio Laws, Part VI, 10752, 10926-10927. Before that time, R.C. 2929.03 provided that the penalties available in a capital case were death, life with parole eligibility after serving thirty years, and life with parole eligibility after serving twenty years. 146 Ohio Laws, Part IV, 7815, 7816. Thus, life without parole is not an option on remand in this case.

{¶221} Since I do not agree with the determination to reverse appellant's death sentence, it is my view that no remand for resentencing is necessary, and that R.C. 2929.06(B) is not applicable. I simply point out that, given the way this court resolves this case, the applicability of that statute is a potentially troubling issue and should be addressed.

V

Conclusion

{¶222} For all the foregoing reasons, appellant's sentence of death should not be reversed. A presumption of prejudice is inappropriate in these circumstances. In the absence of any demonstration of actual prejudice, I would find no reversible error, would therefore affirm the judgment of the court of appeals on the alternate-juror question, and would proceed to decide the issues found moot by the lead opinion. Since this court does not take that course of action, I dissent.

F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur in the foregoing opinion.

APPENDIX

{¶223} *Proposition of Law No. I:* Evidence obtained in an illegal search are fruits of the poisonous tree under the Fourth Amendment and Article [I], Section 14 of [sic] the Ohio Constitution. The initial search of Tony Gross' trailer was in violation of the Constitutions. The fruits of this search should have been suppressed.

{¶224} *Proposition of Law No. II:* A warrant issued on the basis of information obtained in an illegal warrantless search of a home violates the Fourth Amendment and Article I, Section 14 of the Ohio Constitution. Samples of blood, hair and fingernail scrapings taken from Tony Gross pursuant to such a warrant must be suppressed.

{¶225} *Proposition of Law No. III:* The photographic identification and follow up procedures used with several witnesses were so suggestive that they led

to unreliable pre-trial and in-court identification that subverted the fairness of the fact finding process at both the trial and penalty phases.

{¶226} *Proposition of Law No. IV:* Show-up identification procedures used with witnesses Karen Wright and Shawn Jones were unnecessarily suggestive and conducive to irreparable mistaken identification. Neither of their in-court identifications of Tony Gross nor testimony concerning the prior identifications should have been admitted at trial.

{¶227} *Proposition of Law No. V:* Gross was entitled to a fair and reliable determination of guilt or innocence as well as sentence by an impartial jury under Article I, Sections 2, 9, 10 and 16 and the Fifth, Sixth, Eighth and Fourteenth Amendments. The jury selection process here denied Gross such a fair and impartial jury.

{¶228} *Proposition of Law No. VI:* Introduction of "other acts" evidence, except under limited, clearly defined circumstances denies a criminal defendant of a fair trial and due process. The introduction of "other acts" evidence that Tony Gross dealt in "crack" caused undue prejudice, unfairly denied him due process, a fair trial, and a fair and reliable sentencing hearing in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, as well as Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶229} *Proposition of Law No. VII:* The evidentiary errors that pervaded the trial deprived to [sic] Gross of due process, a fair trial, and a fair and reliable sentencing determination.

{¶230} *Proposition of Law No. VIII:* The jury must be given clear and legally correct jury instructions to [e]nsure a fair and reliable determination of guilt or innocence at the trial phase of a capital case.

{¶231} *Proposition of Law No. IX:* Duplicative aggravating circumstances improperly tipped the weighing process, in violation of the Fifth, Sixth, Eighth and

Fourteenth Amendments, as well as Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶232} *Proposition of Law No. X:* Jury instructions at the penalty phase must convey to the jury adequate information to adequately guide the jury's exercise of its discretion. The instructions here failed to provide the mandated guidance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments as well as Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶233} *Proposition of Law No. XI:* Tony Gross was convicted and sentenced to death in a trial conducted in an emotional atmosphere based on victim impact evidence and argument in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments as well as Article [I], Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶234} *Proposition of Law No. XII:* Due process permits convictions only upon proof beyond a reasonable doubt. The state failed to introduce sufficient evidence upon which to premise a conviction for aggravated murder, as well as the other charged crimes. Tony Gross' convictions and sentence of death deprived him of due process as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as Article I, Sections 2, 9, 10 and 15 [sic] of the Ohio Constitution.

{¶235} *Proposition of Law No. XIII:* A defendant in a capital prosecution is guaranteed the effective assistance of counsel by the Fifth, Sixth, Eighth and Fourteenth Amendments and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution. The performance of trial counsel fell far below the prevailing professional norms, and was therefore unreasonable, denying Gross the effective assistance of counsel.

{¶236} *Proposition of Law No. XIV:* A capital defendant is entitled to a fair and reliable determination of his guilt and sentence by a jury that is properly instructed and that follows the court's instructions. Where the jury ignores the

court's admonitions and discusses the case outside of the jury room and where jurors intimidate other jurors there is a denial of due process and a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, as well as Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶237} *Proposition of Law No. XV:* The convictions and sentence of death imposed upon Tony Gross violate the Fifth, Sixth, Eighth and Fourteenth Amendments as well as Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution because of the cumulative effect of the errors throughout both phases of the trial, the pretrial preparation and litigation, the motion for a new trial and the appellate process.

{¶238} *Proposition of Law No. XVI:* The death sentence is inappropriate in this case.

{¶239} *Proposition of Law No. XVII:* Where proportionality review is a necessary component in the appellate review of a capital case, due process and equal protection are denied when the state courts' review is limited.

{¶240} *Proposition of Law No. XVIII:* The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article [I], Sections 2, 9, 10 and 16 of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio's statutory provisions governing the imposition of the death penalty do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied to Tony Gross.

_____

D. Michael Haddox, Muskingum County Prosecuting Attorney, for appellee.

David C. Stebbins and S. Adele Shank, for appellant.

_____